Vugo, Inc. v. City of New York

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2018

(Argued: February 28, 2019          Decided: July 16, 2019)

Docket No. 18-807
_____

VUGO, INC.,

*Plaintiff-Appellee,*

—v.—

CITY OF NEW YORK,

*Defendant-Appellant.*

_____

B e f o r e:

KATZMANN, *Chief Judge*, LIVINGSTON and DRONEY, *Circuit Judges*.

_____

Defendant-Appellant the City of New York (the "City") appeals from a
February 22, 2018 opinion and order entered in the United States District Court

for the Southern District of New York (Abrams, *J.*) denying the City's motion for summary judgment and granting Plaintiff-Appellee Vugo, Inc.'s motion for summary judgment. The district court concluded that the City's rules banning advertisements in for-hire passenger vehicles, such as Ubers and Lyfts, violate the First Amendment, primarily because the City permits certain advertising in taxicabs. On appeal, the City argues that its ban survives First Amendment scrutiny, notwithstanding the limited taxicab exception, because it directly advances the government's interest in improving the passenger experience and is no more extensive than necessary to advance that interest. We agree. Accordingly, we **REVERSE**.

—————————————

RONALD J. RICCIO (Steven J. Shanker, Eliott Berman, *on the brief*), McElroy, Deutsch, Mulvaney & Carpenter, LLP, New York, NY, *for Plaintiff-Appellee*.

KATHY CHANG PARK (Richard Dearing, Claude S. Platton, *on the brief*), *for* Zachary W. Carter, Corporation Counsel of the City of New York, New York, NY, *for Defendant-Appellant*.

—————————————

KATZMANN, *Chief Judge*:

This appeal concerns a First Amendment challenge to nearly twenty-year-old New York City rules that ban advertisements in for-hire vehicles ("FHVs") absent authorization from the Taxi and Limousine Commission (the "TLC" or the "City"). *See* 35 R.C.N.Y. §§ 59A-29(e)(1), 59B-29(e)(1). A similar rule has applied to yellow and green taxicabs (collectively, "taxicabs," "taxis," or "cabs") for over two decades. *See* 35 R.C.N.Y. § 58-32(f). The TLC originally enacted these

2

bans because, as the record reflects, passengers find in-ride advertisements—particularly, as relevant here, video advertisements—extremely annoying. However, in 2005, the TLC permitted a limited category of advertisements in taxis: those displayed on the screens of new equipment that the TLC required taxis to install ("Taxi TV"). This new equipment allows taxi riders, *inter alia*, to track the progress of their metered fare and pay by credit card. The TLC authorized advertising on Taxi TV to offset the cost to the taxi owners of installing the newly mandated equipment.

Plaintiff-Appellee Vugo, Inc. ("Vugo") has challenged the rules banning advertisements in FHVs because it wants to sell an advertising software platform it developed for certain FHVs, including Ubers and Lyfts. Vugo primarily argues that the ban is impermissibly underinclusive under the First Amendment because the City's interest in enacting the ban bears no relationship to the City's justification for exempting Taxi TV advertising.

The parties agree that the prohibition on advertising in FHVs is a content-based restriction on commercial speech and, as such, is subject to intermediate scrutiny. *See Central Hudson Gas & Elec. Corp. v. Public Servs. Comm'n*, 447 U.S. 557 (1980). Under *Central Hudson*, courts ask whether (1) the expression is protected

3

by the First Amendment; (2) the asserted government interest is substantial; (3) the regulation directly advances the government interest asserted; and (4) the regulation is no more extensive than necessary to serve that interest. *Id.* at 566. The district court concluded that the ban fails the third prong of this test because the City's justification for the Taxi TV exception (compensating taxi owners for the cost of new equipment) "bears no relationship whatsoever" to the City's asserted interest (protecting passengers from annoying advertisements). Special App. at 16. Considering the fourth prong in tandem with the third, the district court also concluded that the ban was more extensive than necessary to advance the City's interest.

We respectfully disagree. First, we think there is a sufficient nexus here between the ban and its exception because both advance the City's interest in improving the overall passenger experience. Second, the ban would be constitutional even if there were not such a relationship. The absence of a relationship between a government's interest in a ban and its basis for any exceptions may render a ban unconstitutionally underinclusive. Most notably, it may demonstrate that the ban was motivated by bias or remains incapable of achieving its stated aims. Here, however, on the uncontroverted record, the

4

exception neither reflects discriminatory intent nor renders the ban ineffective at improving the in-ride experience for millions of New York City residents and visitors. The Taxi TV exception reflects the City's reasonable decision that the costs of permitting advertisements in taxicabs were outweighed by the benefits of compensating taxicab owners for the expense of installing new equipment that facilitated credit card payment and improved ride data collection. Vugo identifies no grounds for us to upset this policy judgment. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 512 (1981) (plurality opinion). Finally, we conclude that the City's ban is not substantially more restrictive than necessary to achieve the City's aims under the final prong of *Central Hudson*.

Accordingly, we **REVERSE** the judgment of the district court and direct the entry of judgment in favor of the City.

## BACKGROUND

### I. Factual History

The material facts are undisputed. "[T]ransporting passengers for hire by motor vehicle in the city of New York is affected with a public interest, is a vital and integral part of the transportation system of the city, and must therefore be supervised, regulated and controlled by the city." N.Y.C. Admin. Code § 19-501

(legislative findings). The New York City Council has tasked the TLC with regulating this critical component of the City's transportation system, which includes both taxis and FHVs. N.Y.C. Charter §§ 2300, 2303(a).

The term "taxicab" refers to yellow cabs and green cabs, which are the only vehicles the TLC allows to pick up passengers by street hail in New York City. *See* N.Y.C. Admin. Code § 19-504(1).[1] FHVs, by contrast, are vehicles "other than a taxicab" that "carr[y] passengers for hire in the city." N.Y.C. Admin. Code § 19-502(g). FHV rides are prearranged through businesses licensed by the TLC, such as limousine companies and, more common today, companies like Uber and Lyft. *See* N.Y.C. Admin. Code § 19-516(a) ("For-hire vehicles . . . may accept passengers only on the basis of telephone contract or prearrangement."). FHVs comprise a growing share of the passenger vehicle market. As of August 2016, the TLC regulated 94,000 vehicles. More than seventy-five percent of these were

---

[1] Green cabs are formally classified as for-hire vehicles, but this opinion, following the lead of the district court and the parties, defines the term "taxicab" as including green cabs because green cabs are allowed to display advertisements on Taxi TV.

FHVs. Around that same time, riders took approximately 370,000 daily trips in yellow taxis and 213,000 daily trips in Uber and Lyft vehicles.

One of the TLC's statutory mandates is to "promot[e] and protect[] . . . public comfort and convenience." N.Y.C. Charter § 2300. Consistent with this mandate, the TLC sets comprehensive standards for driver licensing, vehicle equipment, and vehicle markings in both taxis and FHVs. For example, the TLC can deny an applicant a license if the applicant has assaulted a passenger or unlawfully denied a passenger service in the past two years, 35 R.C.N.Y. § 58-08 (d); the TLC mandates that taxis be equipped with a partition, 35 R.C.NY. § 58-35(a); and the TLC requires taxi owners to "apply to the exterior of the Taxicab markings approved by the Commission," such as an emblem identifying the owner of the vehicle, while prohibiting the application of other emblems and markings on the exterior of taxicabs. *See* 35 R.C.N.Y. § 58-32(a). Similar regulations apply to FHVs. *See* 58 R.C.N.Y. § 59B-09(b)(5); 58 R.C.N.Y. § 59A-32(a); 58 R.C.N.Y. § 59A-29.

Also in furtherance of this mandate to promote passenger comfort, the TLC—for more than two decades—has prohibited any advertising inside taxicabs except as specifically authorized by the Commission. *See* App. at 288,

7

303-04 (original prohibition, March 1, 1996) ("An owner shall not display inside a taxicab any advertising or other notice not specifically authorized by these [taxicab owner] rules or the Commission's Marking Specifications for Taxicabs unless approved by the Commission."); 35 R.C.N.Y. § 58-32(f) (current prohibition) ("An Owner must not display inside a Taxicab any advertising or other notice not specifically authorized by these rules or the Commission's Marking Specifications for Taxicabs unless approved by the Commission.").

The TLC codified similar rules for FHVs in 1999, which are at issue in this case. 35 R.C.N.Y. §§ 59A-29(e)(1), 59B-29(e)(1).[2] Section 59A-29(e) provides that an "[o]wner must not display any advertising on the exterior or the interior of a For-Hire Vehicle unless the advertising has been authorized by the Commission." Section 59B-29(e)(1), which applies to owners of for-hire base stations—central facilities that manage, organize, and/or dispatch FHVs— contains essentially the same restriction. *See* 35 R.C.N.Y. § 59B-29(e)(1) ("A Vehicle must not display advertising on the outside or the inside unless the

---

[2] Sections 59A-29(e) and 59B-29(e) have been renumbered since their original passage. There have also been minor word revisions. None of those changes substantively altered the rule adopted by the TLC on August 5, 1999.

Commission has authorized the advertising and has given the Vehicle Owner a permit specifying that the advertising complies with the Administrative Code."). Violation of either section subjects the violator to a $50 fine. *See* 35 R.C.N.Y. §§ 59A-29(3), 59B-29(e)(1). The City's position throughout this litigation has been that "[t]he Challenged Rules govern advertising on posters, stickers, or any other format in which one could promote a product or service." City's Reply Mem. of Law in Support of Cross-Motion for Summary Judgment at 10, ECF No. 53, *Vugo, Inc. v. City of New York*, No. 1:15-cv-8253 (S.D.N.Y. Sept. 30, 2016).

The City's prohibition on in-ride advertising has only one exception: advertisements on Taxi TV. TLC authorized this limited form of interior advertising in taxis in May 2005 to allow taxi owners to offset the cost of a new technology system that TLC had recently required vehicle owners to purchase and install. *See* App. at 95 (deposition testimony of Ryan Wanttaja, Deputy General Counsel for the TLC) (the TLC permits interior advertising in yellow and green taxis "principally because of the—or solely because they offset the cost of these mandatory pieces of equipment that provide the additional functionality that the TLC requires").

This new hardware and software system, referred to as the Technology Passenger Enhancements Program ("TPEP") for yellow taxis and the Livery Passenger Enhancements Program ("LPEP") for green taxis, advances the TLC's mandate to innovate and experiment with new designs and modes of service. N.Y.C. Charter § 2303(b)(9). TPEP and LPEP benefit riders, drivers, and the TLC. For example, the screen in these systems, known as the "passenger information monitor," shows passengers their fare as it accumulates, allows passengers to track their route, and accepts credit card payments. In a recent TLC survey, almost sixty percent of passengers chose the ability to pay by credit or debit card as the feature they liked most about taxis. The systems also assist with lost-property inquiries and enable the TLC to inform drivers about areas of high demand and to convey emergency notifications via text message. In addition, the systems produce detailed records—previously maintained by hand—of each taxi trip, including fares and pick-up and drop-off locations. *See* 35 R.C.N.Y. § 58-22. These detailed records allow for comprehensive statistical analysis that informs TLC policy and was not feasible under the prior, paper reporting system.

The TLC required vehicle owners to pay for the TPEP and LPEP systems. Because the TLC did not expect that the "significant" cost of installing these

systems would be offset by any increase in business, App. at 297, the TLC

authorized advertising on the passenger information monitors as a means of

reducing the expense for vehicle owners.[3] *See* 35 R.C.N.Y. § 58-32(f) (exempting

"[a]dvertising on the Technology System," subject to certain restrictions, from

the general ban on interior advertising); App. at 297 ("TLC authorized

advertising in [taxis] simply as a means by which owners could offset the new

cost."). The system allows limited advertising, known as "Taxi TV." 35 R.C.N.Y.

§ 58-32(f) (exempting "[a]dvertising on the Technology System," subject to

certain restrictions, from the general ban on interior advertising).

In response to passenger dissatisfaction with Taxi TV, the TLC has sought

to again entirely eliminate advertising from taxicabs. Approximately one-third of

TLC survey respondents named Taxi TV as the one thing they disliked most

about taxis. The commissioner of the TLC expressed the need to be "responsive"

to passengers who found Taxi TV to be "somewhat of an invasion." App. at 453.

---

[3] Vehicle owners do not directly receive the advertising revenue. Instead, according to the TLC, TPEP and LPEP providers sell the systems at a discount—the TLC estimates for forty to sixty percent less—when the providers can profit from advertising displayed on the screens.

The TLC recently completed a pilot program to test new technologies that could maintain the functionality of TPEP and LPEP without Taxi TV. The executive director of the taxi drivers' union reported that the drivers responded to the proposed change with "utter elation." App. at 458. After the pilot program concluded in June 2018, TLC eliminated its requirement that taxicab technology systems contain monitors to display advertisements. *See* 35 R.C.N.Y. § 66-24(c). Instead, taxi owners must install any technology system that provides certain core functions, including data collection, credit card payment, and communication between drivers and TLC, but that system need not have a monitor. *See id.*; 35 R.C.N.Y. § 58-40(a).

FHVs do not have technology akin to the TPEP and LPEP systems. Indeed, such technology is not necessary in FHVs. FHV fares are usually set in advance (and not subject to the metered rates set for street-hail vehicles), so passengers do not need real-time information about their fare. In addition, FHV passengers less frequently need a device that accepts in-car payment since payment is usually made in advance via a credit card on file. Finally, the TLC does not need to communicate fare opportunities directly to FHV drivers because FHV drivers can only accept passengers that their companies assign to them.

Vugo, a Minnesota-based technology company, has developed a system for displaying video advertisements to FHV passengers. Under Vugo's business model, the vehicle driver purchases an internet-connected tablet and downloads the Vugo app. The driver mounts the tablet on the back of the front seat's headrest so that it faces the passenger seats at eye level. When the passenger's trip begins, the tablet automatically plays advertisements, mostly in video format. Passengers cannot turn off or mute the advertisements (unlike Taxi TV, which can be muted or turned off). Passengers can, however, use on-screen controls to reduce the volume to a "near-mute" level. App. at 180-81. Advertisers pay Vugo, and Vugo splits this ad revenue with drivers. When Vugo contacted the TLC about its plans to enter the New York City market, the TLC confirmed that it did not allow advertising in FHVs.

## II.    Procedural History

Vugo sued the City on October 20, 2015, alleging that the TLC's prohibition on interior advertising in FHVs violates the First Amendment and requesting that the court declare the rules unconstitutional and enjoin their enforcement. Both parties moved for summary judgment. The district court

(Abrams, *J.*) granted summary judgment for Vugo.[4] The court concluded that, while the City had articulated a substantial interest in promoting passenger comfort, there was an insufficient fit between the ban on in-ride advertising and the City's asserted interest because the advertisements on Taxi TV are no less annoying than advertisements in FHVs would be. Moreover, the district court held, the City could have furthered its stated interest by less restrictive means, such as requiring advertising displays in FHVs to contain an on-off switch or mute button.

**DISCUSSION**

**I.      Standard of Review**

We review a decision on cross-motions for summary judgment *de novo*, examining each motion "on its own merits." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011). Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all

---

[4] The district court's judgment has been stayed pending this appeal.

14

inferences in its favor." *Costello v. City of New Burlington*, 632 F.3d 41, 45 (2d Cir. 2011); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (when considering cross-motions for summary judgment, "all reasonable inferences must be drawn against the party whose motion is under consideration"). It is the government's burden to justify its rules as consistent with the First Amendment. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571-72 (2011); *United States v. Caronia*, 703 F.3d 149, 164 (2d Cir. 2012).

## II.  The City's Prohibition on In-Ride Advertising Does Not Violate the First Amendment

The challenged rules affect only commercial advertising.[5] "The First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation." *Central Hudson*, 447 U.S. at 561. Both parties assert that *Central Hudson*'s intermediate

---

[5] Although the advertising ban, on its face, also covers non-commercial advertising—and there is record evidence that the ban has, in fact, been applied to non-commercial advertising—the parties and the district court proceeded on the assumption that the ban applies only to commercial speech. Since the parties agree on appeal that the ban applies only to commercial advertising, we assume that is the case for purposes of this decision.

15

scrutiny test applies because the rules regulate commercial speech. We agree, and further conclude that the prohibition survives this test.

### A.  The Proper Level of Scrutiny

We must first briefly address what "intermediate scrutiny" under *Central Hudson* requires after *Sorrell*. Although Vugo expressly concedes that *Central Hudson*'s intermediate scrutiny test applies, Vugo also contends that content-based restrictions on truthful commercial advertising are "presumptively invalid" after *Sorrell*, Appellee Br. at 18, implying that something more akin to strict scrutiny applies.[6] We hold that the *Central Hudson* test still applies to commercial speech restrictions.

---

[6] The City does not dispute that the ban, construed as applying only to commercial advertising, is content-based. We see no reason to conclude otherwise. "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.* That said, regulations that apply generally to "advertising" (without regard for whether the advertisements are commercial) may not necessarily be content-based. *See Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1198-1200 (9th Cir. 2016) (holding that city ordinances regulating mobile billboard advertising displays were not content-based because "the word 'advertising' refers to the *activity* of displaying a message to the

The Supreme Court has held that "commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression." *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 477 (1989) (internal alterations, citations, and quotation marks omitted). More recently, in *Sorrell*, the Court stated that "heightened judicial scrutiny" applied to a Vermont law regulating commercial speech because the law "impose[d] burdens that [we]re based on the content of speech and that [we]re aimed at a particular viewpoint." 564 U.S. at 565. However, the Court did not elaborate on what "heightened scrutiny" for content-based restrictions on commercial speech would entail or whether such scrutiny should apply to all commercial speech restrictions. Instead, the Court applied the "special commercial speech inquiry," *i.e.* the *Central Hudson* test, explaining that

---

public, not to any particular content that may be displayed," and "[t]here ha[d] been no suggestion that the ordinances apply differently to . . . political endorsements than to . . . commercial promotional campaigns." (emphasis added)). We need not resolve that broader issue here because the City has stipulated that the ban applies only to commercial advertising and therefore is content-based.

the outcome was the same whether that standard or "a stricter form of judicial scrutiny [was] applied." *Id.* at 571. And the Supreme Court subsequently has suggested that commercial speech restrictions remain "subject to the relaxed scrutiny outlined in *Central Hudson*." *Matal v. Tam*, 137 S. Ct. 1744, 1763-64 (2017).

Following *Sorrell*, this Court has continued to apply *Central Hudson*'s intermediate scrutiny test to commercial speech restrictions. *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 112-13 (2d Cir. 2017); *see also Poughkeepsie Supermarket Corp. v. Dutchess Cty., N.Y.*, 648 F. App'x 156, 157 (2d Cir. 2016) (summary order) ("Restrictions on commercial speech are subject to intermediate scrutiny under *Central Hudson*."). Other Circuits have similarly concluded that the *Central Hudson* intermediate scrutiny test for commercial speech survives *Sorrell*. *See, e.g.*, *Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 842 (9th Cir. 2017) (en banc) ("*Sorrell* did not modify the *Central Hudson* standard."); *1-800-411-Pain Referral Servs., LLC v. Otto*, 744 F.3d 1045, 1055 (8th Cir. 2014) (the "upshot" of *Sorrell* is that "when a court determines commercial speech restrictions are content- or speaker-based, it should then assess their constitutionality under *Central Hudson*"); *Missouri Broadcasters Ass'n v. Lacy*, 846 F.3d 295, 300 n.5 (8th Cir. 2017) (reaffirming that

18

content- and speaker-based commercial speech restrictions are evaluated under *Central Hudson*); *In re Brunetti*, 877 F.3d 1330, 1350 (Fed. Cir. 2017) ("[P]urely commercial speech [is] reviewed according to the intermediate scrutiny framework established in *Central Hudson*."); *Flying Dog Brewery, LLLP v. Michigan Liquor Control Comm'n*, 597 F. App'x 342, 365 (6th Cir. 2015) ("[A]lthough *Sorrell* stated that 'heightened judicial scrutiny' applied, it reaffirmed the use of the *Central Hudson* test."). Other Circuits have avoided the question, noting that the Supreme Court did not resolve the issue in *Sorrell*. *See Educational Media Co. at Va. Tech, Inc. v. Inlsey*, 731 F.3d 291, 298 n.4 (4th Cir. 2013) ("To be sure, the question of whether *Sorrell*'s 'heightened scrutiny' is, in fact, strict scrutiny remains unanswered."); *Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Prof'l Eng'rs & Surveyors*, 916 F.3d 483, 493 n.18 (5th Cir. 2019) ("We do not reach the issue of whether *Sorrell* . . . altered the commercial speech analysis.") ; *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1235 n.7 (11th Cir. 2017) ("We need not wade into these troubled waters . . . because the State cannot survive *Central Hudson* scrutiny."). No Court of Appeals has concluded that *Sorrell* overturned *Central Hudson*.

We agree with our sister circuits that have held that *Sorrell* leaves the *Central Hudson* regime in place, and accordingly we assess the constitutionality of the City's ban under the *Central Hudson* standard.[7]

_____

[7] In addition, even if strict scrutiny applied to *some* commercial speech restrictions after *Sorrell*, we doubt it would apply to this one. The statute in *Sorrell* was content- and speaker-based in that it targeted a single category of speech by a single category of speaker: marketing carried out by pharmaceutical manufacturers. *Sorrell*, 564 U.S. at 563-64. The Supreme Court had no doubt that the statute "impose[d] an aimed, content-based burden" on particular speakers. *Id.* at 564; *see id.* at 565 ("Formal legislative findings accompanying [the statute] confirm that the law's express purpose and practical effect are to diminish the effectiveness of marketing by manufacturers of brand-name drugs.").

Here, by contrast, the City's ban covers the full range of commercial advertising. There is no suggestion that the City is trying to "quiet[]" truthful speech with a particular viewpoint that it "fear[s] . . . might persuade." *Id.* at 576. Vugo does not contend that the advertising displayed on its software platform would differ in content from the advertisements displayed on Taxi TV—nor is there any indication in the record that that is the case. Thus, to the extent strict scrutiny might apply to some commercial speech restrictions out of concern that the government is seeking to "keep[] would-be recipients of the speech in the dark," *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 523 (1996) (Thomas, *J.*, concurring), or otherwise prevent the public from receiving certain truthful information, that concern is not present here. *See also id.* at 503 (Stevens, *J.*, plurality opinion) (joined by Kennedy, *J.* and Ginsburg, *J.*) ("The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.").

**B.     The Prohibition Survives Scrutiny Under *Central Hudson***

Under *Central Hudson*, we must determine whether: (1) the speech restriction concerns lawful activity; (2) the City's asserted interest is substantial; (3) the prohibition "directly advances" that interest; and (4) the prohibition is no more extensive than necessary to serve that interest. 447 U.S. at 566; *see also Centro de la Comunidad Hispana*, 868 F.3d at 113. The parties agree that the first prong is satisfied. Accordingly, below we consider only the remaining three prongs.

**1.     Prong Two: The City's Asserted Interest**

The district court held that the City's asserted interest—to protect passengers from the annoying sight and sound of in-ride advertisements—is substantial. We agree.

Vugo's argument to the contrary mistakes the relevant inquiry. Vugo argues that the City's ban was "designed" to suppress speech that "some people didn't like," and that the City cannot ban advertisements just because it "believes the content of advertising is 'uniquely annoying.'" Appellee Br. at 23 (quoting City's Mem. of Law in Support of Cross-Motion for Summary Judgment at 20, ECF No. 48, *Vugo, Inc. v. City of New York*, No. 1:15-cv-08253 (S.D.N.Y. Aug. 26,

21

2016)); *see also Tam*, 137 S. Ct. at 1765 (articulating the "fundamental principle of the First Amendment that the government may not punish or suppress speech on disapproval of the ideas or perspectives the speech conveys").

The second prong of *Central Hudson*, however, asks us to evaluate the City's *asserted* goal in enacting the regulation. Here, the City's asserted goal is to protect its citizens from the offensive sight and sound of advertisements—not their content—while they are traveling through the city by car.[8] That interest is clearly substantial. City governments have a substantial interest in cultivating "esthetic values" and preventing "undue annoyance." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984); *Village of Schaumburg v. Citizens for a Better Envm't*, 444 U.S. 620, 632 (1980); *see also Metromedia*, 453 U.S. at 507-08 ("the appearance of the city" is a "substantial governmental" interest); *Kovacs v. Cooper*, 336 U.S. 77, 87 (1949) (governments are empowered to protect "the quiet and tranquility so desirable for city dwellers"); *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 103-04 (2d Cir. 2010)

---

[8] In support of this argument, the City submitted evidence that passengers find the fact, not the content, of in-ride advertisements annoying.

("protecting the aesthetic appearance of a city" is a substantial government goal that justifies regulating the display of advertisements). This is as true in publicly regulated transportation as it is anywhere else in the city. *See Taxpayers for Vincent*, 466 U.S. at 806 ("[T]he city was entitled to protect unwilling viewers against intrusive advertising that may interfere with the city's goal of making its buses 'rapid, convenient, pleasant, and inexpensive.'" (citing *Lehman v. City of Shaker Heights*, 418 U.S. 298, 302-03 (1974) (plurality opinion))). Thus, the City's asserted interest is substantial.

### 2. Prongs Three and Four: "Reasonable Fit"

"The last two steps in the [*Central Hudson*] analysis have been considered, somewhat in tandem, to determine if there is a sufficient 'fit between the regulator's ends and the means chosen to accomplish those ends.'" *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 98 (2d Cir. 1998) (quoting *Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 341 (1986)) (alterations omitted). "The burden to establish that 'reasonable fit' is on the government agency defending its regulation, though the fit need not satisfy a least-restrictive-means standard." *Id.* (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416 (1993)). That is, the fit need not be "perfect," but

23

simply "reasonable." *Discovery Network*, 507 U.S. at 416 n.12 (quoting *Fox*, 492 U.S. at 480). *Central Hudson* requires "not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Fox*, 492 U.S. at 480 (internal citations and quotation marks omitted).

### i. Prong Three

To satisfy the third prong of *Central Hudson*, the City must demonstrate that (1) "the harms it recites are real," and (2) "that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 771 (1993). Vugo argues, and the district court agreed, that the in-ride advertising ban fails at this third prong because the exception for advertising on Taxi TVs renders the ban unconstitutionally underinclusive. We disagree.

As an initial matter, we conclude that the City has substantiated the harm it seeks to prevent. The Supreme Court has "permitted litigants to justify speech restrictions by reference to studies and anecdotes," such as those submitted by the City. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (internal citation and quotation marks omitted). In this case, the City provided survey data indicating that passengers dislike Taxi TV. In response to a 2011 survey of taxi passengers, nearly one-third of respondents indicated that "Taxi TV is

24

annoying." App. 313. Passengers have complained that the screens are difficult to turn off and cause motion sickness. They have singled out the advertisements on Taxi TV as especially irritating. Vugo points to only one contrary piece of evidence in the record: a November 2015 Quinnipiac University survey finding that forty-five percent of respondents found Taxi TV to be a "pleasant diversion" while forty-one percent deemed it an "annoyance." App. at 482, 487, 490. This single third-party survey does not provide a basis for us to second guess the City's conclusion that in-ride advertisements are annoying to its citizens—a conclusion it reached based on its own survey results and firsthand experience receiving complaints from customers.[9]

Next, we must consider whether the City's prohibition on advertising in taxicabs and FHVs adequately alleviates these harms, despite the exception for Taxi TV. "Although a law's underinclusivity raises a red flag, the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1668 (2015) (quoting *R.A.V. v. St. Paul*, 505 U.S.

---

[9] Moreover, we see no reason why the City may not seek to alleviate a harm when the harm is experienced by forty-one percent of the population.

377, 387 (1992)); *see also Anderson v. Treadwell*, 294 F.3d 453, 463 (2d Cir. 2002)

("[U]nderinclusiveness will not necessarily defeat a claim that a state interest has

been materially advanced." (citing *Metromedia*, 453 U.S. at 511 (plurality

opinion))). Indeed, "[i]t is always somewhat counterintuitive to argue that a law

violates the First Amendment by abridging *too little* speech." *Williams-Yulee*, 135

S. Ct. at 1668. Underinclusiveness is problematic insofar as it, *inter alia*, "raise[s]

doubts about whether the government is in fact pursuing the interest it invokes,

rather than disfavoring a particular speaker or viewpoint," or "reveal[s] that a

law does not actually advance a compelling interest." *Id.*; *see also City of Ladue v.

Gilleo*, 512 U.S. 43, 52-53 (1994) ("Exemptions from an otherwise legitimate

regulation of a medium of speech may be noteworthy" because of the "risks of

viewpoint and content discrimination" and because such exemptions "may

diminish the credibility of the government's rationale for restricting speech in the

first place."); *Clear Channel*, 594 F.3d at 106 ("A regulation may [] be deemed

constitutionally problematic if it contains exceptions that 'undermine and

counteract' the government's asserted interest." (quoting *Rubin v. Coors Brewing

Co.*, 514 U.S. 476, 489 (1995))). The Supreme Court has also found impermissible

regulations that draw distinctions between categories of speech that "bear[] no

relationship *whatsoever* to the particular interests that the [government] has asserted." *Discovery Network*, 507 U.S. at 424; *see also Clear Channel*, 594 F.3d at 106.

The City's in-ride advertising ban is not unconstitutionally underinclusive. *First*, the ban materially advances the City's interest in reducing passenger annoyance, notwithstanding the Taxi TV exception.[10] *Second*, the City's justification for the Taxi TV exception is sufficiently related to its interest in enacting the ban because both are aimed at improving the overall in-ride experience, albeit in different ways: the Taxi TV exception facilitated the installation of equipment that (among other things) enabled passengers to pay for taxi rides by credit card, which is their decided preference, and the ban applicable to FHVs frees passengers from advertisements, which they find annoying. *Third*, the ban would survive intermediate scrutiny even if the exception and the ban were not related because such a relationship is not an independent requirement under the First Amendment. The "relationship test" is

---

[10] Vugo does not contend that the government's real end is to discriminate on the basis of message.

an analytical tool that in some circumstances indicates that a speech restriction is unconstitutional because it casts doubt on whether a regulation is "'part of a substantial effort to advance a valid state interest.'" *Clear Channel*, 594 F.3d at 108 (quoting *Bad Frog Brewery*, 134 F.3d at 100). That is not the case here.

### a. The Taxi TV Exception Does Not Undermine the City's Asserted Interest

The exception for Taxi TV does not render the ban ineffective. This case is unlike *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) and *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173 (1999), on which Vugo relies. In *Rubin*, the government asserted that a prohibition on the disclosure of alcohol content on beer labels would combat the problem of beer companies competing for customers on the basis of alcohol content ("strength wars"). *Rubin*, 514 U.S. at 488. The Court explained that the scheme did not make "rational sense" because other provisions of the scheme left open ubiquitous avenues for strength wars— such as television advertising for beer—that "directly undermine[d] and counteract[ed] [the] effects" of the ban on such disclosure on labels. *Id.* at 488, 489. The "irrationality" of the "regulatory framework *ensure[d]* that the labeling ban w[ould] fail to achieve its end." *Id.* at 488 (emphasis added). Similarly, in

*Greater New Orleans Broadcasting*, the Court found that exceptions to a prohibition on advertisements about gambling—for, among other things, tribal gambling authorized by state compacts and government-operated casinos—swallowed the rule, since the regulation "merely channel[led] gamblers to one casino rather than another." 527 U.S. at 189. In this case, by contrast, the Taxi TV exception does not wholly undermine the effectiveness of the general restriction on in-ride advertising by allowing the proliferation of advertisements to the same degree through other avenues, as in *Rubin*, or by channeling riders to taxicabs where there are offensive in-ride advertisements, as in *Greater New Orleans*.

Nor is the exception so large that the rules fail to directly advance New York's interest in reducing the number of annoying ads passengers must endure. *See Discovery Network*, 507 U.S. at 417-18 (regulation did not substantially advance the city's interest because it eliminated only 4% of unsightly news racks); *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 73 (1983) (striking down prohibition that "provide[d] only the most limited incremental support for the interest asserted"); *Bad Frog Brewery*, 134 F.3d at 100 ("[A] state must demonstrate that its commercial speech limitation is part of a substantial effort to advance a valid state interest, not merely the removal of a few grains of offensive sand from

29

a beach of vulgarity."). On the record before the district court, the FHVs covered

by the challenged rules accounted for over one-third of daily TLC passenger trips

in 2016. Special App. at 15; App. at 482-83.[11] As a result, over one-third of the

TLC's ridership is spared advertisements during their rides. This reduction is

substantial. *See United States v. Edge Broadcasting Co.*, 509 U.S. 418, 432-33 (1993) (a

regulation that reduced the percentage of radio air time playing lottery ads from

49% to 38% "significan[tly]" advanced the government's interest). The

government is not required to "make progress on every front before it can make

progress on any front." *Id.* at 434.

### b. The Justification for the Taxi TV Exception Is Not Too Attenuated from the Justification for the Commercial Advertising Ban

Vugo next argues that the ban is unconstitutional because the justification

for the Taxi TV exception is unrelated to the justification for the commercial

advertising ban. Appellee Br. at 30-33. Vugo relies on *Discovery Network*, in which

---

[11] The number of FHV rides relative to taxicab rides continues to grow. *See, e.g.*, Johana Bhuiyan, *Ride-hail apps like Uber and Lyft generated 65 percent more rides than taxis did in New York in 2017*, Vox (Mar. 15, 2018, 5:16 PM), https://www.vox.com/2018/3/15/17126058/uber-lyft-taxis-new-york-city-rides (in December 2017, FHVs made 65% more pickups than taxis).

the Supreme Court considered a ban enacted by the City of Cincinnati on newsracks dispensing commercial publications, but not newsracks dispensing newspapers. Cincinnati enacted the ban to "ensur[e] safe streets and regulat[e] visual blight." 507 U.S. at 415. Yet, the exempted newspaper newsracks were "equally unattractive" and "arguably the greater culprit because of their superior number." *Id.* at 425, 426. Cincinnati justified nevertheless excluding newspaper newsracks from the ban on the ground that "commercial speech has only a low value." *Id.* at 425-26, 418-19. The Court held that this justification for distinguishing between noncommercial and commercial publications was insufficient because the distinction had "absolutely no bearing on the interests [the City] ha[d] asserted." *Id.* at 428.

Vugo suggests that the "relationship test" set out in *Discovery Network* requires that the justification for the exception appeal to the *identical* interest asserted by the City in supporting the restriction. On that view, the only legitimate basis for exempting any advertisements from the City's ban would be that such advertisements are less annoying than others. *See* Special App. at 16-17. According to Vugo, because the City has not argued that advertisements on Taxi TV are any less annoying than advertisements on Vugo's platform would be, the

31

exception is not sufficiently related to the City's asserted interest in passing the ban (*i.e.,* sparing riders from annoying advertisements).

But *Discovery Network* does not impose such a stringent standard. The Supreme Court held only that distinctions that bear "no relationship *whatsoever* to the particular interests that the city ha[d] asserted" are impermissible. *Discovery Network,* 507 U.S. at 424; *see also id.* at 428 ("[T]he distinction . . . has *absolutely no bearing* on the interests . . . asserted." (emphasis added)); *Clear Channel*, 594 F.3d at 106 (regulations that draw "arbitrary distinctions" are unconstitutional). The relationship between Cincinnati's ban and its exception was truly arbitrary: there was no nexus between the allegedly "low value" of commercial speech and the aesthetic and safety interests Cincinnati sought to advance by banning newsracks. The Court suggested that had there been "some basis for distinguishing between 'newspapers' and 'commercial handbills' that [was] *relevant* to an interest asserted by the City," that would have been sufficient. *Discovery Network,* 507 U.S. at 428 (emphasis added).

Moreover, Vugo's interpretation of the "relationship" required under *Discovery Network* conflicts with the Supreme Court's "reject[ion of] 'the argument that a prohibition against the use of unattractive signs cannot be

32

justified on [a]esthetic grounds if it fails to apply to all equally unattractive signs wherever they might be located.'" *Clear Channel*, 594 F.3d at 106 (quoting *Taxpayers for Vincent*, 466 U.S. at 810). If Vugo were right that a government can only distinguish between speech based on its tendency to produce the harm the government seeks to prevent through its prohibition, then a prohibition against the use of unattractive signs could *not* be justified if it failed to apply to all equally unattractive signs wherever they might be located, a position the Supreme Court has rejected.

Here, the City's basis for distinguishing between advertisements on Taxi TV and all other advertisements in taxis and FHVs is sufficiently related to the City's asserted interest. Both the restriction and the exception concern passenger comfort and convenience: passengers prefer not to see advertisements while riding in cabs and FHVs, but they also prefer, for example, to be able to pay for their rides by credit card, which TPEP and LPEP enable. The City's ban seeks to balance these preferences, permitting advertisements exclusively on Taxi TV in order to offset the cost of the TPEP and LPEP systems to vehicle owners. Thus, the City's rules, as a whole, reflect a considered determination about how best to improve the overall experience of passengers riding in taxis and FHVs. *See id.* at

33

108 ("[T]here is clearly a relationship between the City's Zoning Resolution, which regulates the placement of outdoor commercial advertising, and its interest in aesthetics and traffic safety."); *see also Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 905 (9th Cir. 2009) ("*Central Hudson* requires a logical connection between the interest a law limiting commercial speech advances and the exceptions a law makes to its own application."). We also note that, unlike in *Discovery Network*, the City's distinction is well-founded and the regulations "go[] a long way," *Metro Lights*, 551 F.3d at 911, toward achieving the City's goal. *See Clear Channel*, 594 F.3d at 108 (finding a "clear" relationship between the distinctions drawn between speech in a zoning resolution and the City's interest in passing that resolution in part because the regulations, "as a whole," were "'part of a substantial effort to advance a valid state interest'" (quoting *Bad Frog Brewery*, 134 F.3d at 100)); *Metro Lights*, 551 F.3d at 911.

### c. The "Relationship Test" in *Discovery Network* Is an Analytical Tool

Separately, even if there were not a sufficient nexus between the City's justifications for the rule and its exception, the City's ban would still pass muster because such a relationship is not an independent requirement under the First

Amendment. Although Vugo insists that the First Amendment categorically requires a relationship between the basis for a ban on commercial speech and the justification for any exceptions to that ban, we find no support for that position in the Supreme Court's decisions addressing regulation of commercial speech, save for a few lines in *Discovery Network*. Placed in the context of *Central Hudson*'s third prong, the relationship between a government's interest in restricting speech and its justification for exempting some speech from that restriction is not a freestanding requirement but rather an analytical tool for assessing whether a regulation is "'part of a substantial effort to advance a valid state interest.'" *Clear Channel*, 594 F.3d at 108 (quoting *Bad Frog Brewery*, 134 F.3d at 100). The absence of a relationship supports—but does not compel—a conclusion that the ban is discriminatory, ineffective, or irrational such that it is unconstitutionally underinclusive.

Sometimes, a disconnect between the government's interest in a speech restriction and the government's justification for exempting certain speech from that restriction reveals that the government is disfavoring a particular speaker or that a law does not actually advance a compelling state interest. That was true in *Discovery Network*, in which the Supreme Court concluded that the newspaper

exception to Cincinnati's newsrack ban both reflected bias against commercial speech and rendered the ban ineffective. 507 U.S. at 419 (the city "seriously underestimate[d] the value of commercial speech"); *id.* at 426 (newspapers were "arguably the greater culprit [of blight] because of their superior number"). It was also true in *Sorrell*, in which the Supreme Court explained that the "exceptions based in large part on the content of a purchaser's speech" were such that "[t]he law on its face burdens disfavored speech by disfavored speakers." 564 U.S. at 564. And in *Rubin*, the Court found that the exceptions "directly undermine[d] and counteract[ed] [the] effects" of the ban. 514 U.S. at 489. In such cases, the exception renders the ban impermissibly underinclusive.

But that is not always the case. The absence of a relationship is not—in its own right—constitutionally fatal. Indeed, exceptions to speech restrictions can be justified on grounds not related to the government's interest in enacting the restriction, so long as the exceptions do not "compromise[]" the "validity" of the government's asserted interest. *Taxpayers for Vincent*, 466 U.S. at 811; *see also Nat'l Fed'n of the Blind v. F.T.C.*, 420 F.3d 331, 346 (4th Cir. 2005) ("A distinction among speakers is . . . not objectionable per se, but only because it renders implausible the government's claim that the regulation making this distinction is narrowly

36

tailored to address a certain interest."). In *Taxpayers for Vincent*, for example, the Court found an exception for signs on privately owned land justified in part by "[t]he private citizens' interest in controlling the use of his own property," which was not related to the "visual assault . . . presented by an accumulation of signs" that the City sought to stem through its regulation. 466 U.S. at 811, 807. In *Clear Channel*, we upheld a regulation banning billboard advertising near highways in New York City, except for signs on Transit Authority property, even though the city had identified no reason to think that signs on Transit Authority property were less dangerous or ugly than signs on other property. *See* 594 F.3d at 106. We explained that "[t]he fact that the City has chosen to value some types of commercial speech over others does not make the regulation irrational." *Id.* at 109 (internal citation omitted). And, in *Metromedia*, the plurality opinion accepted the city's judgment that commercial enterprises, as well as the public, had a greater interest in onsite advertising than offsite advertising and accordingly decided that "the city's interests in traffic safety and [a]esthetics . . . should yield" in the case of the former but not the latter. 453 U.S. at 512 (plurality opinion).

On the logic of these decisions, the First Amendment allows a government to carve out exceptions to a speech restriction for reasons unrelated to the

37

government's basis for enacting the restriction in the first place. *See Nat'l Fed'n of the Blind*, 420 F.3d at 345 (the First Amendment requires only "a legitimate 'neutral justification' for" regulating some speakers but not others (quoting *Discovery Network*, 507 U.S. at 429-30)). Otherwise, a government could never address competing concerns by crafting exceptions to speech restrictions. For example, a government could never pass a regulation reflecting its judgment that its interest in aesthetics were outweighed by some commercial interests (onsite advertising) but not others (offsite advertising). *See Metromedia*, 453 U.S. at 512 (plurality opinion). The First Amendment does not impose such stringent constraints on government decision-making.

In this case, although the City's reason for excluding Taxi TV from its in-ride advertisement ban is not directly related to the City's interests in enacting the ban, the exclusion is nevertheless rational.[12] *See Clear Channel*, 594 F.3d at 109. The rules "reflect[] a decision by the city that" its interest, and the public's interest, in the LPEP and TPEP systems "is stronger than the [C]ity's interests in

_____

[12] As already noted, *supra* note 10, Vugo does not argue that the City was in fact motivated by a desire to restrict a particular category of speech, rather than its stated desire to improve the in-ride experience.

. . . [a]esthetics." *Metromedia*, 453 U.S. at 512. We see no basis to upset the City's policy judgment.

### ii. Prong Four

Finally, under *Central Hudson*'s fourth prong, the City must establish "that the regulation [does] not burden substantially more speech than is necessary to further the government's legitimate interests." *Clear Channel*, 594 F.3d at 104; *see also Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 265 (2d Cir. 2014) (assessing whether an ordinance was "more restrictive than necessary to effectuate the government's legitimate interests"). In other words, the government must "affirmatively establish" a reasonable fit between the regulation and its goal. *Fox*, 492 U.S. at 480. This prong does not require "that there be no conceivable alternative" to the government's approach, or that the government's regulation be the least restrictive means of advancing its asserted interests. *Id.* at 478; *see also Clear Channel*, 594 F.3d at 104. In addition, the City is afforded "considerable leeway in determining the appropriate means to further a legitimate government interest." *Clear Channel*, 594 F.3d at 105 (internal alterations and quotation marks omitted). We are "loath to second-guess the [g]overnment's judgment to that effect." *Fox*, 492 U.S. at 478; *see also id.* at 481 ("[W]e . . . provide the Legislative and Executive

39

Branches needed leeway in a field . . . traditionally subject to governmental regulation." (internal quotation marks omitted)).

The City's determination here about how to regulate in-ride advertising is "reasonable." *Clear Channel*, 594 F.3d at 104. Vugo, in effect, contends that, instead of entirely banning advertising in FHVs, the City could carve out a Taxi TV-like exception for FHVs. Specifically, Vugo argues that the TLC could allow video advertising but require that the hardware include an on-off switch or mute button, and/or impose content-neutral limitations on the placement and size of the video advertisements. Appellee Br. at 34. We have before rejected a contention analogous to the one that Vugo raises here. In *Clear Channel*, plaintiff argued that the city should have "adopted a 'size and spacing' regulatory regime" rather completely prohibiting the display of signs in certain locations. *Clear Channel*, 594 F.3d at 105. We disagreed, deferring to the city's judgment about "the appropriate means to further [its] legitimate governmental interest." *Id.* Similarly, in *Metromedia*, the Supreme Court explained that "[i]f the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective

approach to solving the problems they create is to prohibit them." 453 U.S. at 508;

*see also Taxpayers for Vincent*, 466 U.S. at 817; *Fox*, 492 U.S. at 480-81.

Here, too, we must defer to the City's judgment. The record shows that,

notwithstanding the limitations the City places on Taxi TVs, passengers find the

advertisements on Taxi TV annoying. Therefore, a restriction on the size of the

devices on which FHV drivers would run Vugo's platform would not

substantially further the interests the City's ban seeks to advance. In addition, the

record supports the City's position that on-off or mute buttons would not

eliminate the harms identified by passengers that the ban seeks to redress, given

that passenger complaints about Taxi TV often include frustration with

malfunctioning on-off switches and mute buttons—and with needing to navigate

the on-screen interface in order to obtain peace and quiet in the first place. In

other words, Vugo's suggested modifications to the regulatory scheme would

replicate the precise system that has already proved to hinder passenger comfort

and convenience.

Thus, we conclude that the City's determination that banning ads

altogether is the most effective approach was reasonable. Like the ban on

billboards in *Taxpayers for Vincent*, *Metromedia*, and *Clear Channel*, the City's

prohibition is the "most direct and perhaps the only effective approach" to prevent the harms of intrusive and annoying advertisements. *Taxpayers for Vincent*, 466 U.S. at 817 (internal quotation marks omitted).

## CONCLUSION

The City's prohibition on advertising in FHVs does not violate the First Amendment under *Central Hudson*. The City's asserted interest is substantial, the prohibition "directly advances" that interest, and the prohibition is no more extensive than necessary to serve that interest. Accordingly, we REVERSE the judgment of the district court and direct the entry of judgment in favor of the City.