*The Art & Antique Dealers League of Am., Inc. v. Seggos*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2021

(Argued: March 4, 2022    Decided: November 13, 2024)

Docket No. 21-569

_____

THE ART AND ANTIQUE DEALERS LEAGUE OF AMERICA, INC., THE NATIONAL ANTIQUE AND ART DEALERS ASSOCIATION OF AMERICA, INC.,

*Plaintiff-Appellants*,

v.

BASIL SEGGOS, in his official capacity, as the Commissioner of the New York State Department of Environmental Conservation,

*Defendant-Appellee*,

and

THE HUMANE SOCIETY OF THE UNITED STATES, CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL, INC., WILDLIFE CONSERVATION SOCIETY,

*Intervenor-Defendant-Appellees*.\*

_____

---

\* The Clerk of Court is respectfully directed to amend the caption to the form above, so as to reflect the correct name of the National Antique and Art Dealers Association of America, Inc., as well as the correct party status of the Humane Society of the United States, Center for Biological Diversity, Natural Resources Defense Council, Inc., and Wildlife Conservation Society as Intervenor-Defendant-Appellees, as above.

Before:

LEVAL, SULLIVAN, and PÉREZ, *Circuit Judges*.

In their suit challenging New York State Environmental Conservation Law § 11-0535-a (the "State Ivory Law"), Plaintiffs The Art and Antique Dealers League of America, Inc. and The National Antique and Art Dealers Association of America, Inc. appeal from the judgment of the United States District Court for the Southern District of New York (Schofield, *J.*) in favor of Defendant Basil Seggos, the Commissioner of the New York State Department of Environmental Conservation. The district court dismissed Plaintiffs' claim that the State Ivory Law is preempted by the federal Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, and its implementing regulations, and granted summary judgment for Defendant on Plaintiffs' claim that the State Ivory Law violates free speech rights guaranteed by the First Amendment, while denying Plaintiffs' motion for summary judgment on the First Amendment claim. We AFFIRM the dismissal of the preemption claim. On the other hand, we REVERSE the grant of summary judgment on the constitutional claim and direct the district court to grant summary judgment in favor of Plaintiffs.

JUDGE SULLIVAN dissents in a separate opinion.

CALEB R. TROTTER, Pacific Legal Foundation, Sacramento, CA (James M. Manley, Pacific Legal Foundation, Phoenix, AZ, Alan E. Sash, McLaughlin & Stern, LLP, New York, NY, *on the brief*), *for Plaintiff-Appellants*.

GRACE X. ZHOU, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Steven C. Wu, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General, State of New York, New York, NY, *for Defendant-Appellee*.

2

RALPH E. HENRY (Rebecca A. Cary, *on the brief*), The Humane Society of the United States, Washington, DC, *for Intervenor-Defendant-Appellees*.

LEVAL and PÉREZ, *Circuit Judges*:

In their suit challenging New York State Environmental Conservation Law § 11-0535-a (the "State Ivory Law"), The Art and Antique Dealers League of America, Inc. and The National Antique and Art Dealers Association of America, Inc. (together, the "Dealers" or "Plaintiffs") appeal from the judgment of the United States District Court for the Southern District of New York (Schofield, *J.*) in favor of Defendant Basil Seggos ("Defendant" or the "State"), sued as the Commissioner of the New York State Department of Environmental Conservation ("DEC"). Plaintiffs seek relief from the State's enforcement against them of the State Ivory Law and a licensing restriction thereunder, which prohibits licensees from "physically display[ing] for sale within New York State any [ivory] item that is not authorized for Intrastate sale" (the "Display Restriction"). App'x at 100. Plaintiffs contend that they are entitled to this relief on two grounds: First, because pertinent portions of the State Ivory Law are preempted by the federal Endangered Species Act

3

("ESA"), 16 U.S.C. § 1531 *et seq.*, and its implementing regulations, and, second, because the Display Restriction violates their free speech rights under the First Amendment. The district court dismissed Plaintiffs' preemption claim, granted summary judgment for Defendant on the First Amendment claim, and denied Plaintiffs' motion for summary judgment on the First Amendment claim. We affirm the dismissal of the preemption claim. On the other hand, we reverse the grant of Defendants' motion for summary judgment on the constitutional claim and direct the entry of judgment in favor of Plaintiffs, barring Defendant from enforcing the Display Restriction against Plaintiffs' members.[1]

## BACKGROUND

### I. The Pertinent Rules Governing Commerce in Ivory

In 1973, Congress enacted the ESA, restricting commerce in products made from endangered and threatened species. 16 U.S.C. § 1538. Pursuant to that statute, the United States Fish and Wildlife Service ("FWS") has promulgated regulations, which classify Asian elephants and most species of

---

[1] Because barring enforcement of the Display Restriction is based in part on Defendant's decision not to contest an issue of law that is an essential element of the claim, we need not and do not rule on whether the Display Restriction is in fact consistent with the First Amendment.

rhinoceros to be "endangered species." *See* 50 C.F.R. § 17.11. In addition, the FWS classified African elephants as a "threatened species" and issued special rules regulating commerce relating to them in a manner similar to the prohibitions governing endangered species. *See id.* § 17.40(e).

The ESA prohibits the import and export of endangered species and any part or product derived from them, 16 U.S.C. § 1538(a)(1)(A); *id.* § 1532(8), as well as their sale, offering for sale, or movement in interstate and foreign commerce, *id.* § 1538(a)(1)(D)–(F). Similar prohibitions apply to African elephant products. 50 C.F.R. § 17.40(e).

These restrictions are subject to exceptions, two of which are relevant here. First, § 1539(h) of the ESA, which the statute characterizes as an "exception" to its prohibitions, *see* 16 U.S.C. § 1539(h)(2) ("Any person who wishes to import an article under the *exception* provided by this subsection shall submit . . . ." (emphasis added)), provides that the ESA's prohibitions do not apply to certain qualifying "antique articles" that are at least 100 years of age (the "Antiques Exception"), *see id.* § 1539(h)(1), which may be imported into the United States by one who obtains a federal permit, *id.* § 1539(h)(2). Second, FWS's regulation governing African elephants prohibits the sale or

offer for sale "in interstate or foreign commerce" of ivory, except for certain items containing "*de minimis*" amounts of ivory (the "De Minimis Exception"). 50 C.F.R § 17.40(e)(3). This regulation is also characterized as an "exception." *Id.* § 17.40(e) ("[p]ersons seeking to benefit from the *exceptions* provided in this paragraph (e) must demonstrate . . . " (emphasis added)). The De Minimis Exception is satisfied if, among other things, 1) the ivory makes up no more than 50 percent of the object's volume or value; 2) the total weight of its ivory component is less than 200 grams; and 3) it was manufactured or handcrafted before July 6, 2016. *Id.* § 17.40(e)(3)(iii), (v)–(vii).

The State Ivory Law, enacted in 2014, provides that, subject to specified exceptions, "no person shall sell, offer for sale, purchase, trade, barter or distribute an ivory article or rhinoceros horn." N.Y. Env't Conserv. Law § 11-0535-a(2). New York's exceptions are narrower than the federal exceptions. For example, the State Ivory Law authorizes the DEC to "issue licenses or permits for the sale, offering for sale, purchase, trading, bartering or distribution" of certain "bona fide antique[s]" ("DEC licenses"). *Id.* § 11-0535-a(3). To qualify as a "bona fide antique," an item must be at least 100 years

6

old, and the ivory or horn component must make up less than twenty percent of the item's total volume. *Id.* § 11-0535-a(3)(a).

These exceptions to the State's prohibitions differ from the exceptions to the federal prohibitions in two important ways. First, the State law's exception for antiques applies only to items consisting of less than twenty percent ivory, while the ESA's Antiques Exception contains no such limitation. Accordingly, commerce in antique products consisting of twenty percent ivory or more runs afoul of the State Ivory Law but not necessarily of the ESA. Second, the State Ivory Law, unlike the federal regulation, does not include a *de minimis* exception for items containing small amounts of African elephant ivory that are not necessarily antiques.

The State Ivory Law authorizes the DEC Commissioner to issue licenses or permits for the sale of certain ivory articles. *Id.* § 11-0535-a(3). Trading in ivory without a DEC license or permit may incur civil and criminal penalties. *Id.* §§ 71-0924(4), 71-0925(16). These licenses contain a number of conditions that bind the licensees. One such condition, the Display Restriction, provides that licensees "shall not physically display for sale within New York State any item that is not authorized for Intrastate sale." App'x at 100. Licensees may

advertise these items in print or online, as long as they include a notice that the items may not be bought or sold in the State of New York. *Id.*

## II.    This Litigation

The Dealers' complaint alleges that the State Ivory Law is preempted by the ESA and its implementing regulations. It also asserts that the Display Restriction, a condition of DEC licenses, violates the First Amendment. The Humane Society of the United States, Center for Biological Diversity, Natural Resources Defense Council, Inc., and Wildlife Conservation Society ("Intervenors") intervened as defendants. The district court dismissed Plaintiffs' preemption claim. *Art & Antique Dealers League of Am., Inc. v. Seggos*, 394 F. Supp. 3d 447 (S.D.N.Y. 2019). Following discovery, the district court denied Plaintiffs' motion for summary judgment and granted summary judgment to Defendant on the First Amendment claim. *Art & Antique Dealers League of Am., Inc. v. Seggos*, 523 F. Supp. 3d 641 (S.D.N.Y. 2021). Plaintiffs brought this appeal.

DISCUSSION

## I.     Preemption

We turn first to the question of preemption. The Dealers contend that the district court erred in rejecting their claim that the State Ivory Law is preempted by the ESA and its implementing regulations. Having reviewed the grant of a motion to dismiss *de novo*, *Fink v. Time Warner Cable*, 714 F.3d 739, 740–41 (2d Cir. 2013), we agree with the district court that the State Ivory Law is not preempted.[2]

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under the doctrine of federal preemption, "state and local laws that conflict with federal law are without effect." *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d

---

[2] In their briefs to this court, the Dealers allude to a second argument—that the Display Restriction is also preempted. This argument does not appear to have been raised below, and the district court did not address it. Furthermore, because we grant Plaintiffs an injunction against enforcement of the Display Restriction against them, Plaintiffs' claim of preemption of that provision is moot. We do not address it.

Cir. 2010) (internal quotation marks omitted). There are three types of

preemption:

> (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.

*Id.* at 104 (internal quotation marks omitted). Because Plaintiffs have

abandoned their field preemption argument on appeal, we consider only

express and conflict preemption. Appellants' Br. at 23 n.7.

### A. Express Preemption

Express preemption occurs where "Congress . . . withdraw[s] specified

powers from the States by enacting a statute containing an express

preemption provision." *Arizona v. United States*, 567 U.S. 387, 399 (2012); *see*

*also CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

The ESA includes an express preemption clause. It reads as follows:

> Any State law or regulation which applies with respect to the importation or exportation of, or interstate or foreign commerce in, endangered species or threatened species is void to the extent that it may effectively (1) permit what is prohibited by this chapter or by any regulation which implements this chapter, or (2) prohibit what is authorized pursuant to an exemption or permit provided

for in this chapter or in any regulation which implements this chapter. This chapter shall not otherwise be construed to void any State law or regulation which is intended to conserve migratory, resident, or introduced fish or wildlife, or to permit or prohibit sale of such fish or wildlife. Any State law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided for in this chapter or in any regulation which implements this chapter but not less restrictive than the prohibitions so defined.

16 U.S.C. § 1535(f).

This appeal requires us to interpret the first sentence of the preemption provision. We begin with the text of the statutory provision and its surrounding context. The first sentence (relating to state laws and regulations that concern importation, exportation, and interstate and foreign commerce) is in two clauses. Clause 1 addresses state law that is more permissive than the ESA, in that it purports to allow conduct that is prohibited by federal law. Clause 2, the clause that concerns us here, addresses state law that is stricter than the ESA, in that it prohibits conduct that is allowed under federal law.

The Dealers argue that Clause 2 preempts the State Ivory Law, or at least those provisions of it that effectively prohibit transactions that the ESA allows (such as the interstate sale of certain antique products consisting of more than twenty percent ivory and of non-antiques containing a *de minimis*

amount of African elephant ivory). They argue that "Congress used exceedingly broad language" in its express preemption provision. Appellants' Br. at 30. We disagree. The scope of the pertinent portion of the ESA's preemption clause is narrower than the Dealers recognize, and the preemption provision as a whole expresses a clear intention of Congress to allow state law to be more protective of endangered species than the ESA.

Clause 1, relating to more permissive state law, does indeed use very broad language. It voids any state law that "permit[s] what is prohibited by this chapter." 16 U.S.C. § 1535(f). If Congress had intended, as the Dealers (and the dissenting opinion) contend, that Clause 2 preempt equally broadly, voiding any state law to the extent that it prohibits conduct that the ESA permits, the natural way to draft Clause 2 would have been to employ the same broad formula as used in Clause 1. The clause would likely have read, "Any state law . . . is void to the extent that it may . . . prohibit what is authorized *by this chapter*." Congress, however, did not employ such broad language. Clause 2 employs what appear to be far more narrow terms. It voids state law only to the extent that it "may effectively prohibit what is authorized *pursuant to an exemption or permit provided for* under this

12

chapter . . . ." *Id.* (emphasis added). In our view, Congress did not add the phrase "pursuant to an exemption or permit provided for" without reason.

The Dealers and the dissent argue that the change of language does not matter—that the terminology Congress employed communicates the same meaning as it would have if it had expressly voided provisions of state law that "may prohibit what is authorized by this chapter." Evaluating the Dealers' argument requires that we examine the taxonomy established in the ESA to determine what the Act means by "authorized pursuant to an exemption or permit." *Id.* We find that this inquiry is answered by § 1539 of the ESA. *Id.* § 1539. In § 1539, the terms "exemption" and "permit" are employed in a narrow and precise fashion that distinguishes them from other limitations on the scope of the ESA's regulatory sweep. *See id.* § 1539(a), (b), (d), (f). The section suggests an altogether rational justification for why Congress, in Clause 2, expressly preempted state laws that prohibit conduct authorized by these precise exemptions and permits, but not state laws that prohibit conduct that the ESA does not regulate.

Section 1539 sets out "exceptions" to the ESA's prohibitions. Included among these "exceptions" are "exemptions" and "permits," as well as other

categories of "exceptions" that are not "exemptions" or "permits." Certain exceptions (other than exemptions and permits) result from simple application of the terms of the statute or the regulations promulgated under it. These provisions expressly narrow the Acts's prohibitions. "Exemptions" and "permits," which are particular categories of "exceptions," are different. They refer to administrative actions, taken by the Secretary of the appropriate Department,[3] that expressly grant an applicant authorization to engage in conduct that the ESA otherwise prohibits. "Exemptions" and "permits" do not result from simple application of the terms of the statute (or the regulations promulgated under it), but from administrative individualized grants of authority by the Secretary of the empowered Department.

Various subsections of §§ 1536 and 1539 confirm this interpretation of "exemption" by explaining the administrative procedure for obtaining an exemption. For example, § 1539(f), for certain endangered species parts owned prior to the Act's passage, explains that "Any person seeking an exemption described in paragraph (2) of this subsection shall make application therefor to the Secretary in such form and manner as he shall

---

[3] The statute's references to the "Secretary" mean in different instances the Secretary of the Interior, of Commerce, or of Agriculture. *See* 16 U.S.C. § 1532(15).

14

prescribe . . . ." *Id.* § 1539(f)(3). This section also requires that the Secretary "publish notice in the Federal Register of each application for an exemption or permit which is made under this section" and "invite the submission [of comments] from interested parties." *Id.* § 1539(c). It places the burden of proving that an "exemption" or "permit" is applicable and valid on "any person claiming the benefit of any exemption or permit." *Id.* § 1539(g). Section 1539(b)(1), pertaining to "[h]ardship exemptions," provides that "the Secretary, in order to minimize [undue economic] hardship, may exempt such person from the application of section 1538(a) of this title to the extent the Secretary deems appropriate if such person applies to him for such exemption . . . ." *Id.* § 1539(b)(1). Likewise, § 1536 discusses "exemptions" at length, outlining that an "exemption" is an expressly designated authorization by the Secretary which is issued in response to an application. *See, e.g., id.* § 1536(g)(1) ("[A] permit or license applicant may apply to the Secretary for an exemption for an agency action . . . ."). All these references combine to make clear that, in the Act's terminology, "exemptions," like "permits," are administrative grants of authorization, unlike provisions of the

Act which, by their terms, automatically provide exclusions from the scope of the Act's coverage.

The Act repeatedly uses "exemption" in this fashion. More than eighty times in §§ 1536 and 1539, the Act uses forms of the word "exemption" (including "exempt," "exempted," and "exemptions") to refer to the Secretary's administrative grant of an application. *See generally* 16 U.S.C. §§ 1536, 1539.  In every instance (save one, which we discuss below) of those more than eighty references to "exemptions," the word refers to an administrative individual grant of authorization by the Secretary and not to an authorization that results from a categorical, self-executing application of the terms of the statute, such as the Antiques Exception and De Minimis Exception.

In contrast, the statute uses the word "exception" to denote (in addition to "exemptions" and "permits") provisions that categorically narrow the scope of the Act's coverage by simple application of the statutory terms without need for administrative action. Thus, the Antiques Exception refers to itself as an "exception" and categorically excludes certain transactions from the coverage of the Act by simple application of the Act's provisions. *See id.*

§ 1539(h)(2). The De Minimis Exception similarly provides that sale or transportation of ivory in interstate or foreign commerce is prohibited "*[e]xcept* for antiques and certain manufactured or handcrafted items containing de minimis quantities of ivory." 50 C.F.R § 17.40(e)(3) (emphasis added). Neither is referred to as an "exemption" or "permit."

Our conclusion that the ESA's use of the word "exemption" refers to such an administrative grant of authority is further reinforced by the Act's similar usage of the word "permit," with which the term "exemption" is paired in the preemption clause. A "permit," according to dictionary definition, is an individualized act of authorization: "[a] certificate evidencing permission; an official written statement that someone has the right to do something." *Permit*, Black's Law Dictionary (12th ed. 2024). The ESA uses the term "permit" exclusively to refer to such written individual authorizations. *See, e.g.*, 16 U.S.C. § 1539(a)(2)(C) ("The Secretary shall revoke a permit issued under this paragraph if he finds that the permittee is not complying with the terms and conditions of the permit."). The *noscitur a sociis* canon of statutory interpretation suggests as a guide to interpretation of statutory ambiguities that a word should be "known by the company it keeps." *Gustafson v. Alloyd*

17

*Co.*, 513 U.S. 561, 575 (1995). Although our interpretation of "exemption" does not depend upon it, the canon sensibly suggests here, because of the statute's coupling of "exemption" with "permit," that both words refer to administrative individualized authorizations issued in response to an application. Further, the other two instances in which the ESA uses the phrase "exemption or permit" refer to individualized administrative authorizations, and both appear directly after a subsection outlining individualized exemptions for which an application to the Secretary is required. *See* 16 U.S.C. § 1539(c) (referring to "each application for an *exemption or permit*" (emphasis added)); *id.* § 1539(g) ("[A]ny person claiming the benefit of any *exemption or permit* under this chapter shall have the burden of proving that the exemption or permit is applicable, has been granted, and was valid and in force at the time of the alleged violation." (emphasis added)).

It remains for us to apply the definitions derived from § 1539 to the words of the express preemption provision of § 1535 and to consider the meaning that Congress intended. We have discussed at some length the first sentence of the preemption provision and the meaning of its second clause. However, the meaning is best understood if one takes into account the

entirety of the provision, rather than only the clause in contention. As a whole, the preemption provision's three sentences complement one another and clarify Congress's desired goal.

The first sentence addresses state laws relating to importation, exportation, or interstate or foreign commerce in endangered or threatened species. *See* 16 U.S.C. § 1535(f). With respect to these activities, Clause 1 voids state laws that would permit conduct that is prohibited by the ERA. *Id.* If the ESA prohibits conduct that state law allows, the federal law prevails, and the state law purporting to allow the conduct is void. The statute, however, has no comparable provision voiding any state law that is more protective of endangered species than the ESA. Clause 2 deals with this sort of conflict between state and federal law in a precise, narrowly tailored way. When the state law purports to prohibit conduct for which a Secretary has issued an express individualized authorization (in the form of an exemption or a permit), only then must the state law yield. *Id.* The primacy of federal law is preserved so that the recipient of the Secretary's exemption or permit will be

allowed to do what the Secretary has expressly authorized by an exemption or permit.

Congress's limitation on the scope of Clause 2 was purposeful, a conclusion that the preemption provision's second sentence bolsters. The next sentence expressly states, in part, "This chapter shall not otherwise be construed to void any State law or regulation which is intended to conserve migratory, resident, or introduced fish or wildlife . . . ." *Id.* This emphasizes that the policy of the ESA, with respect to preemption, is not to compel the states to adopt standards that conform to the federal statute. To the contrary, protection of endangered species is the Act's goal, so that state laws that protect the endangered species more fully than the ESA are allowed to remain in force notwithstanding the disparity, unless preempted in the narrow circumstances detailed in Clause 2.

The final sentence of the preemption provision further clarifies this policy goal. The final sentence concerns "the taking of an endangered species." *Id*. The Act's intention to protect endangered species from takings is even stronger than its intention to protect them from "importation or exportation . . . or interstate or foreign commerce." *Id*. Thus, the final sentence

is more protective of endangered and threatened species than Clause 2 of the first sentence. It provides, "Any State law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided for in this chapter or in any regulation which implements this chapter but not less restrictive than the prohibitions so defined." *Id*. In other words, where state laws and the ESA are in conflict with respect to a taking, in that the state law forbids a taking that is permissible under the ESA, the state-law prohibition is not preempted; it remains valid even when the particular taking has been expressly authorized by a permit or exemption granted by the Secretary.

Thus, all three sentences of the ESA's express preemption provision take pains to provide that state laws establishing protections for endangered and threatened species beyond those established by the ESA are not voided. The fact that Congress intended to so empower states to enact protections of endangered species going beyond those adopted in the ESA is underlined in the House Report. We look to this legislative history to confirm our interpretation of the text. The House Report clearly expresses Congress's intention that "states would and should be free to adopt legislation or

21

regulations that might be more restrictive than that of the Federal Government and to enforce the legislation." H.R. Rep. No. 93-412, at 7 (1973). The preemption provision of § 1535(f) is consistent with this expressed intention to preserve, rather than preempt, state regulation that is more protective of endangered or threatened species than the ESA.

Finally, Congress's distinction between "exceptions" on the one hand, and "exemptions and permits" on the other, makes logical sense, especially when considering Congress's declared intention, noted above, to leave states free to protect species more broadly than the ESA does. Through the express preemption provision, Congress gave effect to individualized decisions made by federal officials, via an exemption or permit, notwithstanding a contrary provision of state law. As a result, state law may be more protective of endangered and threatened species than the federal law, unless the state law would countermand a considered, individualized decision of a department of the federal government. Our interpretation of the preemption clause would countenance states enacting legislative protections of protected species broader than the protections enacted in the ESA, but would preempt states from nullifying particular individualized decisions made by the Secretary, on

22

the assumption that the Secretary presumably had good reasons based on federal policy for granting such exemptions and permits.

For all these reasons, we conclude that the phrase "authorized pursuant to an exemption or permit provided for in this chapter," 16 U.S.C. § 1535(f), refers to grants of individualized authorization by the Secretary and not to self-executing, categorical exceptions carved out from the scope of the ESA's prohibitions. As such, the De Minimis and Antiques Exceptions are not "exemptions or permits" that can give rise to express preemption. Because neither the De Minimis Exception nor the Antiques Exception is an "exemption or permit," the ESA's preemption clause does not void state statutes that prohibit conduct that those exceptions carve out from the scope of the statute's prohibitions.

Plaintiffs finally point to the ESA's savings clause in the second sentence of the express preemption provision. They argue that the clause's preservation of state power to "permit or prohibit sale" of "migratory, resident, or introduced fish or wildlife," 16 U.S.C. § 1535(f), suggests that Congress meant to allow states to enact their own measures to conserve resident species, while leaving the regulation of non-resident and foreign

23

species to the federal government. Such an inference would be contrary to the legislative history discussed above, and there is no need to rely on it here. The ESA's preemption clause explicitly lays out the criteria for preemption. As discussed above, the Antiques and De Minimis Exceptions, as they are not "exemption[s] or permit[s] provided for in [the ESA or its implementing regulations]," *id.*, do not meet those criteria.

We therefore find that the ESA's express preemption clause does not expressly preempt the State Ivory Law.

## B. Response to the Arguments of the Dissenting Opinion

The dissenting opinion relies on several arguments regarding express preemption, each of which we find unpersuasive. First, it relies on a dictionary definition of "exemption"— "[f]reedom from a duty, liability, or other requirement; an exception," *Exemption*, Black's Law Dictionary (11th ed. 2019)—to show that the word means nothing different in this context from an "exception." Because those two words can be used to mean the same thing, the dissent argues that the statute uses the two words interchangeably, without differentiation, so that, for any usage in the statute of either word, the other could be substituted without affecting the meaning. Because, according

to dictionary definition, to be "exempted" from obligations is to be "excepted" from them, the dissent argues that the two words necessarily have the same meaning and are used interchangeably in the ESA.

We do not dispute that an "exemption" is an "exception." Indeed, the ESA treats an "exemption" as an "exception." But Congress is free to use words in statutes with an assigned meaning, and it has done so in the ESA. It has chosen to establish "exemptions" (as well as "permits") as subcategories of "exceptions." "Exceptions" include both statutory provisions that diminish the scope of the statute's prohibitions and individualized grants by the Secretary that authorize one to act in a manner that might otherwise violate the statute's terms. "Exemptions," in contrast, are limited to the latter. And in the preemption provision of § 1535, which preempts state law only when it prohibits conduct that a federal official has authorized by means of an "exemption or permit," the distinction between "exception" and "exemption" becomes crucial. 16 U.S.C. § 1535(f). The fact that Congress could have used the words interchangeably does not mean that it did.

In making this argument, the dissenting opinion does not confront evidence of Congress's intent, which undermines its reading. For starters, it

would be needlessly confusing for Congress to use different words interchangeably to mean the same thing, without any reason to do so. The dissent suggests no reason why Congress would have wished to sow needless confusion in this manner. As we have explained above, examination of the actual usage of the two words reveals that Congress used them to mean slightly different things. *See supra* pp. 13–18.

The dissent does not ask, much less answer, why, in § 1539, entitled "Exceptions," Congress would have switched to the word "exemption" when discussing individualized grants by the Secretary of "exceptions" that resemble "permits," if the change of words meant nothing. *See id.* § 1539(b). The opinion, furthermore, brushes aside as meaningless the fact that for more than eighty times (with only one exception), Congress used "exemption" in the ESA to refer to this particular type of exclusion, akin to the grant of a permit.

Second, based on the single instance in which the ESA uses "exemption" to refer to a categorical, self-executing exception from the Act's prohibitions, the dissent argues that this single nonconforming use among

more than eighty shows Congress's intention to use the two words interchangeably. Dissenting Opinion at 5–6 (citing 16 U.S.C. § 1538(b)).

The argument is not convincing. Where Congress has 1) clearly documented, as in § 1539, its intention to use "exemption" as a narrower subcategory of "exception" to mean an individualized authorization by the Secretary; 2) adhered to that formula more than eighty times throughout the ESA to create a carefully structured preemption schema, allowing state prohibitions broader than that of the ESA's prohibitions except when the federal authorization results from an individualized grant by the Secretary; and 3) confirmed in the House Report its intention to leave states free to enact broader protections of endangered species than those established by the Act, it seems far more reasonable to view this single deviation as an understandable slip-up, rather than as a nullification of what Congress so carefully crafted. We do not agree with the dissent's argument that this one nonconforming use of "exemption" changes the meaning of the more than eighty statutory usages of the term and thereby nullifies a highly sensible, carefully structured scheme of preemption.

Third, the dissent notes that the implementing regulations of the ESA do not adhere to the taxonomy, which is so scrupulously followed in the Act itself, but appear to use "exception" and "exemption" interchangeably to mean the same thing. The dissent then argues that we should interpret the Act as using those terms interchangeably as they are used in the regulations.

This argument is certainly not frivolous. We would be on firmer ground if the regulations adhered to § 1539's taxonomy, using "exemption" with a narrower meaning than "exception." Nonetheless we do not find the argument convincing.

Since the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), terminating the era of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), the importance of agency interpretations of statutes is much diminished. "The [Administrative Procedure Act] . . . codifies," the *Loper* Court wrote, "for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment." 144 S. Ct. at 2261. An administrative agency does not have authority to pass regulations that are inconsistent with the meaning of a

28

statute. The fact that the implementing regulations at times fail to observe the distinction drawn by the Act between "exception" and "exemption" does not mean that the statute uses these words interchangeably. In the post-*Chevron* era, regardless of whether a statute is deemed to be ambiguous or unambiguous, interpretation of the statute is a question of law, and accordingly, it is the court, and not the administrative agency, that determines its meaning. *See id*. While the court may of course be persuaded by the correctness of the agency's interpretation, *see Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944), the court is not required to defer to the agency's interpretation. *Id*. The court makes its own determination of the meaning of ambiguous provisions. *Loper Bright*, 144 S. Ct. at 2273.

For this instance, we have no doubt, given the care with which Congress structured the relationship between "exceptions" and "exemptions," and the consequence it intentionally gave to the difference between them with respect to preemption, that Congress did not give the two words the same meaning in the ESA.

We recognize that the one, perhaps only, circumstance in which consequences attach to distinctions between "exception" and "exemption" is

the operation of the preemption provisions of § 1535. No regulation was drafted to help implement it. It is therefore entirely possible that, in drafting of the regulations, the agency failed to perceive the importance of the precise, narrow meaning the Act gives to "exemption."

Finally, the dissent argues that its interpretation is supported by the fact that the Marine Mammal Protection Act, which is cross-referenced in the ESA, does not distinguish between "exceptions" and "exemptions." Dissent at 7. We are not persuaded. The Marine Mammal Protection Act is a distinct act. Its usages do not override the system of usages carefully established in the ESA.

## C. Conflict Preemption

The Dealers further contend that the State Ivory Law is nullified by virtue of the doctrine of conflict preemption. Even if the State Ivory Law is not expressly preempted by the ESA, under the doctrine of conflict preemption, state law is preempted "where it is impossible for a private party to comply with both state and federal law and where . . . [the state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363,

372–73 (2000) (internal quotation marks and citations omitted). The Dealers argue that the State Ivory Law is an obstacle to the purposes and objectives of the ESA.

The State, however, recognizing a potential for conflict, does not apply its law's prohibitions within the area of conflict and grants licenses to interstate and international sales that are in compliance with the federal law. *Seggos*, 394 F. Supp. 3d at 451. In view of the State's concession, we find there is no further category of transactions where the State law either permits transactions prohibited by federal law or prohibits transactions that are permitted by federal law.

The Dealers nonetheless argue that the State law stands as an obstacle to the ESA's objective of allowing interstate sales of objects within the scope of the ESA's exceptions, because the State's prohibition of intrastate sales of these objects renders it difficult to conduct profitably a business in interstate sales. We agree with the district court that the Dealers' arguments fail to make a case of conflict preemption. "[F]ederal law does not preempt state law under [conflict] preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand

31

together." *Marentette v. Abbott Lab'ys, Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (first alteration in original) (internal quotation marks omitted). It is possible, even likely, that a restriction on intrastate sales could make it much less profitable to be an interstate ivory dealer in New York. However, there is not an irreconcilable conflict between allowing the out-of-State sale of some items and prohibiting the sale of those same items within the State. As discussed above, the DEC will not deny permits for interstate or foreign sales of ivory. Because Plaintiffs are free to sell these items across state lines in accordance with the ESA, there is no basis to conclude that the State Ivory Law undermines the regulatory scheme established in federal law.

We therefore affirm the district court's dismissal of Plaintiffs' preemption claim.

## II. First Amendment

Under the State Ivory Law, those seeking to engage in the "sale, offering for sale, purchase, trading, bartering or distribution of ivory articles" must obtain a license from the DEC. N.Y. Env't Conserv. Law § 11-0535-a(3). The license contains the Display Restriction, which provides that licensees may not "physically display for sale within New York State any item that is

not authorized for Intrastate sale." App'x at 100. Plaintiffs contend that this restriction violates the First Amendment's limited protection of commercial speech.

This claim raises two essential questions. The first question is whether a dealer's display of an ivory product to a potential customer to aid in making a sale, although such display involves neither oral nor written communication, nonetheless constitutes speech protected as such by the First Amendment. Plaintiffs bear the burden on this question. Plaintiffs, however, are relieved of that burden in this case by the fact that Defendant (and Intervenors) conceded the issue by acknowledging that the Display Restriction restrains commercial speech. Defendant and Intervenors do not argue otherwise.

The second question is whether the State-imposed restriction on Plaintiffs' speech passes the test prescribed by the Supreme Court in *Central Hudson Gas & Electric Corporation v. Public Service Commission*, 447 U.S. 557 (1980), for such restrictions on commercial speech. The *Central Hudson* test, as discussed below, raises several issues, and for different issues the burden falls on different parties. The district court rejected Plaintiffs' claim of a First

Amendment violation. It granted the State's motion for summary judgment. We respectfully disagree with the district court's disposition.

The First Amendment, of course, protects speech. Ordinarily, it does not protect conduct. However, in some circumstances, conduct is sufficiently communicative that it can qualify as protected speech. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001). Plaintiffs' claim that the Display Restriction violates the First Amendment inevitably raises the question of whether a dealer's display of ivory products to a potential customer is speech in the first place. *Compare Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 564 ("The First Amendment's concern for commercial speech is based on the informational function of advertising."), *with United States v. O'Brien*, 391 U.S. 367, 376 ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.").

Because the opposing parties have conceded that speech protected by the First Amendment is restrained by the Display Restriction, the question whether Plaintiffs prevail on this issue is, in one sense, simplified, but is, in another sense, complicated.

Defendant's and the Intervenors' concession that the Display

Restriction implicates speech simplifies the determination as to whether

Plaintiffs prevail with respect to this essential element of their case. Because

the adverse parties do not claim otherwise, there is no dispute as to whether a

display of ivory products for sale constitutes speech on which this court must

rule. The court is entitled to treat the concession as dispositive of the issue so

that, if the ultimate judgment turns on this question, Plaintiffs win.

The court's reliance on this concession does complicate the effect such a

ruling has on the law with respect to this issue. A party's concession of an

issue of law on which the adversary bears the burden may eliminate the issue

from the case by relieving the adversary of its burden. Such a concession is

not, however, the equivalent of the court's reaching a decision on a

controverted issue. Otherwise put, a party's concession on a disputed issue of

law may control the outcome of the particular dispute between the parties,

but it does not necessarily establish a legal precedent, which, under the rule of

*stare decisis*, will control the decision of other unrelated cases.

We explore below the significance of the concession. For the moment, it

is sufficient to note that the concession can suffice to ensure that Plaintiffs will

prevail on their First Amendment argument if they succeed on all other elements of their claim.

It is the function of federal courts under the Cases and Controversies Clause of Article III of the Constitution, U.S. Const. art. III, § 2, cl. 1, to rule on disputes among litigants—not to issue proclamations of law. *See Muskrat v. United States*, 219 U.S. 346, 359 (1911). Because Defendant and ~~the~~ Intervenors concede that a dealer's display of an ivory product to a potential customer is speech protected by the First Amendment, there is no dispute among any litigants before us.

Furthermore, unless the answer to the question is obvious, a court is disadvantaged in attempting to reach a reliable conclusion on a question on which no conflicting arguments have been presented. At times, of course, the answer to a question is sufficiently obvious that a court rules on it notwithstanding the absence of dispute, and at other times courts undertake, notwithstanding the concession, to explore the question fully and reach a decision on it without the benefit of opposing arguments.

In this case, we do not believe that the answer to whether a dealer's display is protected speech is obvious. Because the parties have put forth no

36

disagreement on the question and have not furnished us with arguments on either side disputing the question, our court need not, and does not, reach a conclusion on the undisputed issue.

There are many circumstances in which a court may, and should, grant (or deny) relief as between parties based on concessions by the adverse party or deficiencies in the adversary's advocacy, without reaching a conclusion on the merits of the legal question. The most obvious of these occurs where the defendant defaults, in failing either to answer the complaint, or to comply with the court's directions, or to respond to the plaintiff's motion for summary judgment. In such cases, it can be appropriate for the court to grant the relief demanded in the complaint to the plaintiff based on the defendant's failure, without needing to decide whether the law is necessarily as the plaintiff contends.

In such circumstances, the court may lack an adequate basis for reaching a conclusion of law, much less for making a precedential ruling on the question. While a plaintiff might be entitled to relief, such as an injunction or an award of damages, if points of law essential to the plaintiff's case have been conceded or forfeited by the defendant and the plaintiff has prevailed in

proving the remaining essential elements, a court might be well advised to grant the plaintiff relief while refraining from establishing a precedent of law to the effect that the facts of the case constituted a violation of law.

We here find that to be the prudent path. We do not think the answer is obvious whether the Display Restriction affects speech or only non-speech conduct. The failure to argue that speech is not affected has effectively waived that argument and conceded the issue. However, it does not necessarily follow that speech is affected by the restriction. Had contrary arguments been presented to us, we cannot say with confidence that we would not have been persuaded by them. At times, it is difficult to be confident of a conclusion made in the absence of argument to the contrary. We have clear justification (relying on the concession) for deeming Plaintiffs to have prevailed on this essential element of their claim without our reaching a substantive conclusion on the question.

Lawyers' concessions on points of law (and forfeitures by failing to argue them) are tricky and at times inscrutable. They are sometimes tactical in the sense that a lawyer may refrain from making one argument lest it detract from the court's focus on (or even tend to contradict) another argument that

the lawyer considers more important. They can also result from a lawyer's error in judgment—in failing to recognize the strength of an available argument. Accordingly, for courts to proclaim a governing legal precedent based on an adverse party's concession on a point of law creates a significant risk of establishing a bad law, and all the more so when the concession is inferred solely based on the adverse party's failure to argue the point. *See Horne v. Coughlin*, 191 F.3d 244, 246–47 (2d Cir. 1999). A court has a responsibility in establishing a legal precedent to get the law right, especially when the validity of a statute or regulation is at stake. A party's concession on an issue of law may well furnish an adequate basis for granting relief to the adverse party, but is often not an adequate basis for a court to establish a legal precedent that would bind the court and future litigants on the issue.

We accordingly conclude that, by virtue of their adversaries' concessions that the Display Restriction affects speech that is protected by the First Amendment, Plaintiffs are relieved of the responsibility of demonstrating that point. We can therefore assume for the resolution of this case that the restriction affects speech and implicates the First Amendment without establishing a precedent to that effect.

The next questions are what degree of protection is afforded to this commercial speech—intermediate or strict scrutiny, and ultimately whether the Display Restriction is offensive to the First Amendment. Plaintiffs contend that the Display Restriction's interference with their conduct, which was infused with speech, calls for strict scrutiny. Nonetheless, they argue that, even if this speech is less vigorously protected, so that the interfering restriction is judged only under intermediate scrutiny, the restriction nonetheless violates the First Amendment. We examine that contention first.

As a general matter, restrictions on commercial speech are subject to intermediate scrutiny, as set forth in *Central Hudson*. Under the *Central Hudson* test, courts assess "whether (1) the expression is protected by the First Amendment; (2) the asserted government interest is substantial; (3) the regulation directly advances the government interest asserted; and (4) the regulation is no more extensive than necessary to serve that interest." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 44 (2d Cir. 2019) (citing *Cent. Hudson*, 447 U.S. at 566). On this issue, it is Plaintiffs who have made a concession that the State has a substantial interest in stopping illegal sales of ivory goods in New York, and that the restriction advances this interest. Therefore, only the final

prong of the *Central Hudson* test—whether the regulation is no more extensive than necessary—is in dispute.

In determining whether this fourth prong of the *Central Hudson* test is met, we must consider the "fit between the legislature's ends and the means chosen to accomplish those ends." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 486 (1995) (internal quotation marks omitted). We require "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (internal quotation marks and citation omitted). The State "bears the burden of justifying its restrictions." *Id.*

The State contends that there is a reasonable fit between the Display Restriction and the State's interest in preventing illegal sales of ivory. It explains that, if the object for sale, the buyer, and the seller were all physically present in the same location, the risk that the seller would purchase the item on the spot, thereby engaging in an illegal intrastate sale, would be high. By preventing the seller from displaying the ivory object for the buyer's

inspection, the Display Restriction "impedes the immediate consummation of such sales." Appellee's Br. at 49.

Nevertheless, we find, on this record, assuming as the State concedes that the Display Restriction impinges on speech, that the restriction is more extensive than necessary to serve the State's interest. The State argues that the Display Restriction leaves "open ample channels of communication," comparing it to the restrictions that the Supreme Court upheld in *Lorillard*. Appellee's Br. at 43–45 (quoting *Lorillard*, 533 U.S. at 569). There, the Supreme Court upheld restrictions that required retailers to place tobacco products behind counters and required customers to have contact with a salesperson before handling the products. *Lorillard*, 533 U.S. at 569–70. The Court found that the restrictions were an "appropriately narrow means" of advancing the state's substantial interest in preventing minors' access to tobacco products. *Id.* at 569.

But the Display Restriction is undeniably broader than the restrictions upheld in *Lorillard*. Rather than merely regulating the way in which the items are displayed, as the *Lorillard* restrictions did, the Display Restriction prevents *any* display of the product for sale, including ivory goods for lawful interstate

42

or international sale. If a New Jersey customer is interested in a product offered by a New York dealer, for example, that customer cannot travel to New York to see that item before purchasing. Instead, if the customer wants to inspect the item before purchase, that customer and the dealer must arrange for a viewing of the item outside of New York State. The State argues that this is not excessively burdensome because the Dealers can communicate in any other manner—for example, by displaying the item in print or posting information online. The State also notes that "nothing prevents [the Dealers] from physically displaying those products outside New York." Appellee's Br. at 43.

The State's arguments are unpersuasive in light of undisputed facts in the record. While it is true that ivory dealers remain free to advertise their products in print and online, these modes of communication fail to convey adequately information needed by purchasers about the items' quality and authenticity, two factors that are likely of great importance to interested buyers. Indeed, the declaration of the State's own witness, DEC Captain Antone Paluch, corroborates the importance of physical inspection for a purchaser of ivory: "In my experience, it is impossible to assess the

genuineness or the condition and value of ivory without inspecting it in person, and therefore buyers of ivory of significant value are unwilling to make a purchase of ivory that they have not inspected in person." App'x at 144. If it is, as Captain Paluch suggests, impossible to assess quality and authenticity without physical inspection,[4] then the State's Display Restriction amounts to a near-total ban within the State of New York on the conveyance of certain vitally important information about goods for lawful interstate or international sale.

Accordingly, prevention of the display and handling of ivory products, many of which include artistic carvings, is far more detrimental to the sale of ivory than requiring that a salesperson act as intermediary to a customer's handling of a pack of cigarettes is to the sale of cigarettes. The restriction on a customer's handling of a pack of cigarettes does not deny the customer information necessary to the customer's decision to purchase.

---

[4] The State admitted below that "[i]t is impossible to assess the genuineness or the condition and value of ivory without inspecting it in person, and therefore buyers of ivory of significant value are unwilling to make a purchase of ivory that they have not inspected in person." App'x at 186; *see also id.* at 180–81 (admitting that "customers are unlikely to buy ivory objects they are unable to inspect in person"). This fact is undisputed. *See* Appellee's Br. at 41–42 n.11.

The burden of the Display Restriction is only slightly alleviated by the Dealers' ability to arrange for out-of-state inspections. Where certain speech is banned within a particular state, an individual's freedom to engage in that speech outside state borders does not nullify the burden imposed by the restriction. Otherwise, any state restriction on speech, no matter how severe, could be said to be constitutional on the basis that individuals are free to leave the state to engage in the contested speech.

Given the State's concession that exhibiting ivory objects offered for sale falls within the scope of commercial speech, the Display Restriction thus amounts to "suppression of [the] commercial speech" of the Dealers. *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 101 (2d Cir. 1998). While we generally afford a state "considerable leeway . . . in determining the appropriate means to further a legitimate governmental interest, even when enactments incidentally limit commercial speech," *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 105 (2d Cir. 2010) (internal quotation marks omitted) (omission in original), that latitude has its limits.

We find, on this record, that the Display Restriction is more extensive than reasonably appropriate to promote the State's interest in preventing

45

illegal transactions. The Dealers have proposed an alternative solution, which they refer to as "Segregation and Labeling," which would require stores to segregate ivory permitted for sale in interstate or international commerce with a notice informing the viewer that the item cannot be sold in New York.[5] While it is not necessary that the State show that such an alternative would be wholly ineffective,[6] the State must make a "showing . . . that a more limited restriction . . . would not serve adequately the State's interests." *Cent. Hudson*, 447 U.S. at 570. The State has not done so here.

The State relies on a single anecdote in which Captain Paluch described how he, acting in an undercover capacity, purchased an ivory item in an illegal intrastate transaction, despite a sign stating that the item was not for

---

[5] We interpret this proposal to suggest that, while the ivory items at issue would be stored separately, they would be available for inspection upon request. Plaintiffs have also suggested other alternatives, such as the simple segregation of items behind a counter, glass, or rope, a requirement that galleries display a visible notice informing viewers of the State Ivory Law's prohibitions, or a requirement that each ivory item be displayed with a notice stating that it cannot be sold in New York.

[6] Plaintiffs argue that the State must show that the proposed alternative is ineffective. We reject that contention. Under intermediate scrutiny, it is not necessary that a state show that an alternative would not advance the state's interest *at all*. Rather, intermediate scrutiny requires "a fit that is not necessarily perfect, but reasonable." *Fox*, 492 U.S. at 480.

sale.[7] The State contends that this incident illustrates the ineffectiveness of the Dealers' proposed alternative. As Plaintiffs note, however, the merchant in that instance was unlicensed (and therefore had not agreed to abide by the terms of the DEC license, which included the Display Restriction), and the item was not licensed for either interstate or intrastate sale. This single anecdote does not satisfy the State's burden, particularly in light of the alternative measures the Dealers have proposed. *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995) ("[T]he existence of 'numerous and obvious less-burdensome alternatives to the restriction on commercial speech . . . is certainly a relevant consideration in determining whether the "fit" between ends and means is reasonable.'" (omission in original) (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993))). The

---

[7] The State argues that the usefulness of the Display Restriction is additionally supported by the fact that, since the enactment of the State Ivory Law and the accompanying Display Restriction, "the amount of commerce in ivory in New York State has fallen dramatically," with the number of items displayed for sale falling from over 11,000 in 2006 to 224 in 2016. Appellee's Br. at 42–43 (quoting App'x at 145). But this statistic says nothing about how any proposed alternative would fare in comparison to the Display Restriction. The fact that the Display Restriction succeeds in diminishing intrastate sales is not inconsistent with Plaintiffs' contention that a less severe restriction on speech would also adequately serve the State's interest.

Display Restriction also does not prevent a dealer from violating the restriction in the course of conducting an illegal sale.

The district court found that Plaintiffs' proposed alternative would not advance the State's interest "as effectively" as the Display Restriction. *Seggos*, 523 F. Supp. 3d at 648. But this misstates what constitutes a "reasonable fit" under the *Central Hudson* test. The question is not whether the operative restriction is the most effective disposition or is more effective than proposed alternatives. Instead, the relevant question is whether the "scope [of the operative restriction] is in proportion to the interest served." *Long Island Bd. of Realtors, Inc. v. Village of Massapequa Park*, 277 F.3d 622, 627 (2d Cir. 2002) (quoting *Fox*, 492 U.S. at 480); *see also N.Y. State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 844 (2d Cir. 1994) ("*Central Hudson* requires us to evaluate not merely the existence of a particular type of harm but the scope of the restriction in light of the *degree* of the harm."). Therefore, were the State to impose an extraordinarily severe restriction on speech where a much less intrusive alternative would have been nearly as effective in achieving the State's asserted interest, this court could very well find that the fit between the restriction and the interest was not reasonable.

Here, the State has enacted a restriction that prohibits the communication of information that is crucially important to a potential lawful buyer (namely, the quality and authenticity of the item offered for lawful sale) within the State. That restriction places an excessive burden on what we assume, based on the State's concession, is speech. The State has failed to show that its interests would not be adequately served by other measures that would be less burdensome. *See Bad Frog Brewery*, 134 F.3d at 101 (finding that defendant "gave inadequate consideration to alternatives to [a] blanket suppression of commercial speech"). We conclude that the restriction "lacks a reasonable fit" with the State's asserted interest in preventing illegal transactions, *id.* (internal quotation marks omitted), and thus fails the *Central Hudson* test.[8]

We rule that the Dealers are entitled to relief in the form of an injunction barring enforcement against their members of the Display Restriction. For the reasons explained above, however, in so ruling, we rely

---

[8] Plaintiffs contend, based on a footnote in this court's record decision *Vugo, Inc.*, 931 F.3d at 50 n.7, that strict scrutiny, rather than intermediate scrutiny, might apply to these circumstances. *See* Appellants' Br. at 47. As we conclude that Plaintiffs prevail under the intermediate scrutiny test and strict scrutiny would be more favorable to Plaintiffs, we have no need to decide that question.

on the State's concession that the Dealers' display of ivory products to potential customers is speech. We reach no conclusion and state no precedent on whether, if this issue were contested, we would find such display to be speech protected by the First Amendment, and whether we would find the Display Restriction to violate the First Amendment.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's dismissal of Plaintiffs' preemption claim and REVERSE the district court's grant of summary judgment to Defendant on Plaintiffs' constitutional claim. We direct the district court to grant injunctive relief barring the enforcement of the Display Restriction against Plaintiffs and their members. We leave it to the district court whether to issue, in addition, a declaratory judgment that the State may not enforce the Display Restriction against Plaintiffs and their members and whether to grant other relief not inconsistent with this opinion.

RICHARD J. SULLIVAN, *Circuit Judge*, dissenting:

Although I happen to agree with the majority's conclusion that the Display Restriction impermissibly restricts commercial speech under the test enunciated by the Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), I see no reason to even reach that issue since, in my view, the Endangered Species Act (the "ESA"), 16 U.S.C. § 1531 *et seq.*, clearly preempts the New York State Ivory Law (the "NYSIL"), N.Y. Env't Conserv. Law § 11-0535-a. For that reason, I respectfully dissent.

As the majority notes, the ESA contains an express preemption clause, which provides, in relevant part, that "[a]ny State law . . . which applies with respect to . . . interstate or foreign commerce in[] endangered species or threatened species is void to the extent that it may effectively . . . prohibit what is authorized pursuant to an exemption or permit provided for" by the ESA or its implementing regulations. 16 U.S.C. § 1535(f). The Dealers' operative complaint explicitly limits their challenges to "the intrastate sale of ivory" based on the Commissioner's concession that the NYSIL is preempted as to interstate and foreign commerce. *See, e.g.*, J. App'x at 86–87 ¶¶ 74–76, 96–97; *see also Art & Antique Dealers League of Am., Inc. v. Seggos*, 394 F. Supp. 3d 447, 452 (S.D.N.Y. 2019). But it is clear from the

pleadings that the term "intrastate sale[s]" is derived from the Commissioner's definition of that term under the NYSIL. To my mind, the critical question in evaluating preemption is therefore whether the Commissioner's definition of "intrastate" commerce overlaps with the ESA's definition of "interstate" commerce. In my view, it does. For that reason, I would reverse the district court's dismissal of the Dealers' preemption claim.

When construing a statute, we begin with the statutory text. *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004). The ESA provides that it is unlawful to, among other things, sell, offer for sale, or transport products derived from endangered species "in interstate or foreign commerce." 16 U.S.C. § 1538(a)(1)(E)–(F). The ESA then sets forth several exceptions to this prohibition, two of which are relevant here. *First*, the ESA excepts "[c]ertain antique articles" that are "not less than 100 years of age" (the "Antiques Exception"). *Id.* § 1539(h). *Second*, the regulation establishing special rules for African elephants excepts the sale of "certain manufactured or handcrafted items containing *de minimis* quantities of ivory" (the "De Minimis Exception"). 50 C.F.R. § 17.40(e)(3).

The NYSIL similarly prohibits individuals from "sell[ing], offer[ing] for sale, purchas[ing], trad[ing], barter[ing,] or distribut[ing]" ivory articles or rhinoceros

2

horns, subject to certain exceptions. N.Y. Env't Conserv. Law § 11-0535-a(2). The NYSIL also contains an exception for antique articles, but the NYSIL's exception is more restrictive than the ESA's. Under the NYSIL, the article must not only be at least "one hundred years old"; it also must be comprised of "less than twenty percent" ivory by volume. *Id.* § 11-0535-a(3)(a). The NYSIL does not contain an exception akin to the ESA's De Minimis Exception.

These differences make plain that the NYSIL prohibits certain sales of ivory that would otherwise be authorized under the ESA. Specifically, the NYSIL prohibits the sale of antiques that contain more than twenty percent ivory and the sale of non-antiques that contain *de minimis* amounts of ivory – transactions that would be permissible under the ESA. Accordingly, at least with respect to interstate commerce, the NYSIL patently "prohibit[s]" what is "authorized" pursuant to "exemption[s]" provided for by the ESA, thereby falling squarely within the ESA's express preemption clause.

The majority contends that the Antiques and De Minimis Exceptions cannot give rise to express preemption under the ESA because the preemption clause refers to conduct authorized pursuant to an "exemption or permit," rather than an "exception[]." *See* Maj. Op. at 23. But the majority's distinction between

3

"exemptions" and "exceptions" is belied by the ESA itself. As an initial matter, the ESA does not include the words "exemption" or "exception" among its list of defined terms. *See* 16 U.S.C. § 1532. Had Congress intended to limit the meaning of these terms as the majority suggests, it could have easily done so. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994) ("In the absence of . . . a definition, we construe a statutory term in accordance with its ordinary or natural meaning."). And because the ESA's preemption clause uses the terms "exemption" and "permit" disjunctively, *see* 16 U.S.C. § 1535(f), the most natural interpretation of "exemption" is a provision that relieves an individual of an otherwise applicable prohibition or permit requirement. *See Exemption*, Black's Law Dictionary (11th ed. 2019) (defining "exemption" as "[f]reedom from a duty, liability, or other requirement; an exception"). I therefore can see no convincing basis for the majority's contention that Congress intended to create some unspecified category of "exceptions" that are not "exemptions" but merely "carve out[s] from the scope of the statute's prohibitions." Maj. Op. at 23.

The text of the ESA reinforces this view. For example, subsection 1539(d) – titled "[p]ermit and exemption policy" – provides that the Secretary "may grant *exceptions* under subsections (a)(1)(A) and (b) of this section" in certain

4

circumstances.[1]  16 U.S.C. § 1539(d) (emphasis added).  Subsection 1539(a)(1)(A) authorizes the Secretary to issue certain "[p]ermits," and subsection 1539(b) allows the Secretary to grant "[h]ardship exemptions" – both of which are classified as "exceptions" in subsection 1539(d).   Subsection 1539(d) further provides that, in order for any such "exception[]" to be "*grant[ed]*," it must be "*applied for* in good faith."  *Id.* § 1539(d) (emphasis added).  Subsection 1539(d) thereby renders hollow the majority's contention that the terms "exemption" and "permit" are terms of art referring to "administrative grants of authorization," Maj. Op. at 15, while the term "exception" is a distinct, broader term that encompasses "self-executing, categorical . . . carve[] out[s] from the scope of the ESA's prohibitions," *id.* at 23. Subsection 1539(d) confirms that the ESA does not meaningfully distinguish between the terms "exemption" and "exception" when authorizing otherwise prohibited conduct.

Subsection 1538(b)(1) uses the term "exemption" to refer to a self-executing, categorical carve out from the ESA's prohibitions – exactly what the majority

---

[1] The ESA defines the term "Secretary" as "the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970; except that with respect to the enforcement of the provisions of this chapter . . . which pertain to the importation or exportation of terrestrial plants, the term also means the Secretary of Agriculture."  16 U.S.C. § 1532(15).

claims the term "exemption" does not cover. *See* 16 U.S.C. § 1538(b). Specifically, subsection 1538(b)(1) provides an "exemption" to the ESA's explicit prohibitions set forth in "subsections [1538](a)(1)(A) and (a)(1)(G)" so long as certain statutorily prescribed conditions are met. *Id.* The exemption is automatic and does not require an individual grant of authorization by the Secretary for the exemption to apply, *see id.*, belying the majority's contention that the term "exemption[]" only "refers to an administrative individual grant of authorization by the Secretary," Maj. Op. at 16.

The majority brushes aside this language as a regrettable oversight on the part of Congress. *See id.* at 27. But we are not to infer such errors in the drafting of laws. *See E.P.A. v. EME Homer City Generation, L.P.*, 572 U.S. 489, 508–09 ("[A] reviewing court's task is to apply the text of the statute, not to improve upon it." (internal alterations and quotation marks omitted)). The statute makes no distinction between "exceptions" and "exemptions," and neither do the ESA's implementing regulations, which use the terms "exception" and "exemption" interchangeably throughout. *See* 50 C.F.R. § 17.40(f), (g), (j), (n) (referring to section 17.32 – titled "permits for threatened species" – as creating "exemptions"); § 17.40(e), (s), (t), (u) (referring to section 17.32 as creating "exceptions" from

6

prohibitions); § 17.41(e)(2) (describing "exemptions" from prohibitions concerning the Elfin-woods warbler that do not require Secretary approval); *id.* §§ 17.42(g)(2), 17.42(h)(2), 17.43(e)(2), 17.47(b)(3), 17.47(e)(vii)(B) (similar); *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) to explain that courts "may properly resort" to agency interpretations of statutes "for guidance" to determine the meaning of a statute). Furthermore, the Marine Mammal Protection Act – which was passed one year before the ESA and which is repeatedly cross-referenced in the ESA, *see, e.g.*, 16 U.S.C. §§ 1536(b)(4), 1536(o), 1539(e)(4) – likewise uses the term "exemption" to refer to certain categorical exceptions, *see id.* § 1371(b), (d); *see also United States v. Ressam*, 553 U.S. 272, 275–77 (2008) (comparing two statutes enacted within two years of each other to interpret a common word in the subsequently enacted statute); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 252 (2012) ("[L]aws dealing with the same subject . . . should if possible be interpreted harmoniously."); Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 539 (1947) (explaining that statutes should be interpreted in light of related statutes).

The majority also makes much of the fact that some variant of the word "exemption" is used "[m]ore than eighty times in [sections] 1536 and 1539 . . . [to] refer[] to an administrative individual grant of authorization by the Secretary," as opposed to "a categorical, self-executing application of the terms of the statute, such as the Antiques Exception and De Minimis Exception." Maj. Op. at 16. But that comparison is misleading. Section 1536 specifically relates to "[i]nteragency cooperation," so it is no surprise that the references to "exemption" and its derivatives in that section relate to exceptions granted by an agency. 16 U.S.C. § 1536. And as the majority itself concedes, section 1539 explicitly uses both "exception" and "exemption" to describe administrative grants of authorization. Maj. Op. at 26–27. So, in essence, the majority's interpretation again requires the conclusion that Congress made a mistake when drafting that section of the ESA.

In the face of these textual obstacles, the majority resorts to legislative history and "logical sense" to argue that a narrow interpretation of "exemption" best aligns with the "entirety" of subsection 1535(f) and, more generally, Congress's goal of protecting endangered species. *Id.* at 21–24. But subsection 1535(f) is a preemption clause, the purpose of which is to maintain the primacy of federal law. It is not our place to divine implicit goals as cues for the

8

narrow or broad interpretation of the word "exemption" when the plain and ordinary meaning of the term will suffice. Nor does the majority explain why only the Secretary – and not also Congress – must be the provider of exemptions. As noted above, neither term is defined in the ESA, *see* 16 U.S.C. § 1532, and both terms are used interchangeably, *see, e.g.*, *id.* §§ 1538(b)(1), 1539.

For all these reasons, I remain convinced that the undefined term "exemption" in subsection 1535(f) is not exclusively limited to "grants of individualized authorization by the Secretary," Maj. Op. at 23, and that it extends to the Antiques and De Minimis Exceptions defined by Congress. I therefore turn to the question of whether the NYSIL "prohibit[s] what is authorized" pursuant to these exceptions. I believe that it does.

It is indisputably true that the Dealers' operative complaint only explicitly challenges the NYSIL's application to "intrastate" – as distinct from interstate – commerce in ivory. J. App'x at 86–87 ¶¶ 74–76, 96–97. But the use of the term "intrastate sale[s]" clearly tracks the meaning of "intrastate sale[s]" *as defined by the Commissioner for purposes of enforcing the NYSIL*. The district court appears to have uncritically concluded that what the Commissioner considers to be "intrastate commerce" in ivory necessarily falls outside of what the ESA would deem to be

9

"interstate or foreign commerce." *Id.* at 22–23. But it is axiomatic that "[f]ederal courts owe no deference to [a] state agency's interpretation of federal law." *Bey v. City of New York*, 999 F.3d 157, 169 (2d Cir. 2021) (internal quotation marks omitted). It is for us, then, to determine what the Commissioner *means* when he refers to the intrastate sale of ivory.

The Commissioner's briefing was, to say the least, inconsistent on this point.[2] Nevertheless, at oral argument, the Commissioner clarified his position that intrastate sales are those that are conducted within New York state – i.e., where the seller tenders the article and the buyer tenders payment within New York's state borders. He further clarified that the only sales he would characterize as "interstate" – and thus exempt from the NYSIL – are those in which the ivory article is delivered and payment for it is tendered across state lines. *See Dorce v. City of New York*, 2 F.4th 82, 102 (2d Cir. 2021) (explaining that a party is bound by counsel's statements at oral argument). We must therefore determine whether there is overlap between intrastate commerce as defined by the Commissioner –

---

[2] *Compare* Seggos Br. at 10–11 (defining "interstate or foreign sales" as sales involving either "out-of-state buyers" or "out-of-state sellers" (emphasis omitted)), *with id.* at 10 (contrasting "interstate or foreign sales" with sales conducted "within New York" (emphasis omitted)), *and id.* at 11 (defining "intrastate sales" as sales in which all "commercial activity [is] conducted wholly within New York State" (internal quotation marks and emphasis omitted)), *and id.* at 25–26 (contrasting "local retail sales" with "interstate or foreign shipments of products").

i.e., in-person sales of ivory articles in New York state – and interstate commerce as defined in the ESA. In my view, there clearly is.

For starters, the ESA treats the sale and offering for sale of ivory articles in interstate or foreign commerce, *see* 16 U.S.C. § 1538(a)(1)(F), as a category of activity distinct from "deliver[ing], receiv[ing], carry[ing], transport[ing], or ship[ping]" such articles "in interstate or foreign commerce," *id.* § 1538(a)(1)(E). That, to me, strongly suggests that a person can "sell or offer for sale" an ivory article "in interstate or foreign commerce," *id.* § 1538(a)(1)(F), even if he does not "deliver, receive, carry, transport, or ship" it across state lines, *id.* § 1538(a)(1)(E). After all, if the interstate "deliver[y]," "transport[ation]," or "ship[ment]" of an article were a necessary element of its sale "in interstate . . . commerce," *id.* § 1538(a)(1)(E), then every sale prohibited under subsection (F) would *already* be prohibited under subsection (E), making subsection (F) meaningless surplusage. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." (internal quotation marks omitted)); *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013)

11

("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

Moreover, I agree with the Dealers that "because elephants and rhinos are not native to New York," *any* "trade in antiques and art containing ivory" is "inherently . . . interstate commerce." Dealers Br. at 31. Accordingly, I would find that the NYSIL is expressly preempted as to *any* sale of ivory articles covered by the Antiques and De Minimis Exceptions – including sales between New York sellers and New York buyers that are executed wholly within New York state lines.

While I am not aware of any case in which a federal court has construed the phrase "sell or offer for sale in interstate or foreign commerce" as used in the ESA, 16 U.S.C. § 1538(a)(1)(F), several courts, including our own, have interpreted nearly identical language in the Lacey Act of 1900, 31 Stat. 187, a precursor and companion of the ESA in "prohibit[ing] . . . interstate commerce [in] fish or wildlife taken in violation of national, state, or foreign law," *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 174 n.20 (1978). The Lacey Act, in relevant part, makes it unlawful to "sell . . . or purchase in interstate . . . commerce . . . [any] wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law." 16 U.S.C. § 3372(a)(2)(A). Courts applying that language have

12

consistently recognized that what the Commissioner would call an "intrastate sale" is still a sale "in interstate commerce" for purposes of federal law, so long as the wildlife in question was shipped across state or international borders at some point prior to its sale. *See, e.g.*, *United States v. Tempotech Indus., Inc.*, 100 F.3d 941, 1996 WL 14056, at *1 (2d Cir. 1996) (recognizing that presale transportation of salmon eggs between New York and Michigan constituted "interstate transportation and sale" for purposes of the Lacey Act); *United States v. Gay-Lord*, 799 F.2d 124, 125–26 (4th Cir. 1986) (upholding Lacey Act conviction based on transaction that occurred wholly within state lines); *United States v. Sylvester*, 605 F.2d 474, 475 (9th Cir. 1979) (agreeing with district court's holding that "it makes little difference if the completion of the sale precedes or follows the carriage of goods in interstate commerce[,] so long as the transportation or shipment is directly related to the transaction" (internal quotation marks omitted)).

In light of the foregoing, it seems to me that *any* sale of artworks or antiques containing ivory would constitute a sale "in interstate . . . commerce" under the Lacey Act, 16 U.S.C. § 3372(a)(2)(A), even if the buyer and seller resided in the same state and consummated their transaction wholly within the borders of that state. The simple reason is that (as the Commissioner himself concedes)

13

"elephants and rhinoceros are not native to the United States," such that any "ivory or horn" in a product will necessarily have traveled across international boundaries.[3] Seggos Br. at 7. In my view, the same must hold true under the ESA, given how closely its operative language tracks that of the Lacey Act. *Compare* 16 U.S.C. § 1538(a)(1)(F) ("[I]t is unlawful for any person [to] . . . sell or offer for sale in interstate or foreign commerce any [endangered] species."), *with id.* § 3372(a)(2)(A) ("It is unlawful for any person . . . [to] sell . . . in interstate or foreign commerce . . . any fish or wildlife taken . . . in violation of . . . State or . . . foreign law."). Accordingly, I would hold that the NYSIL – even "as applied" only to what the Commissioner defines as "intrastate sale" of ivory articles – "is expressly preempted by the ESA." J. App'x at 87 ¶ 75.

\* \* \*

For the reasons stated above, I believe that the Antiques and De Minimis Exceptions are exemptions covered by the ESA's preemption clause and that the NYSIL impermissibly prohibits what is otherwise authorized by those exceptions. I therefore respectfully dissent from the majority's opinion and would reverse the

---

[3] Neither party has suggested that ivory or horn products have been or could have been harvested from elephants or rhinoceros born in the United States.

14

district court's decision as to the Dealers' preemption claim, without even reaching their First Amendment claim.